## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01359-KMT

KRYSTAL O'CONNELL,

      Plaintiff,

v.

HARRY ALEJO, former Alamosa County Sheriff's Office Sergeant,
MARCIA TUGGLE, former case worker of the Alamosa Department of Human Services,
BOARD of COUNTY COMMISSIONERS of the COUNTY OF ALAMOSA, COLORADO, and
ROBERT JACKSON, SHERIFF OF ALAMOSA COUNTY, COLORADO

      Defendants.

---

### RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Defendants' motion for summary judgment relies on disputed material facts, fails to view the facts in Plaintiff's favor and misconstrues the law. Plaintiff's claims are not collaterally estopped because the judgment (of conviction) has been vacated; absolute immunity does not apply because Plaintiffs' constitutional claims are not based on Defendants' testimony at trial; and qualified immunity does not apply because Defendants' conduct violated Plaintiff's clearly established constitutional rights. Defendants' motion should, in large part, be denied.

**Response to Defendants' Statement of Undisputed Material Facts ("Resp. DSOF")**

1.  Admit.[1]

---

[1] Defendants have redacted references to Kyran Gaston Voss in their exhibits, including in transcripts of public court proceedings and publicly-available court orders. This is unnecessary. Thus, Plaintiff has included in her exhibits unredacted versions of documents where needed.

2.    Deny. Plaintiff's sexual relationship with Patrick Ramirez was no longer ongoing in January 2003. Ex. 1 (O'Connell dep.) at 68:8-17; Ex. 2 (Voss trial testimony) at 1046:4-14.

3.    – 7. Admit.

8.    Admit. *See* Ex. 3 (1/31/03 Ramirez interview tr.); Ex. 4 (1/31/03 Ramirez written statement). Ramirez said that Kyran fell and hit the top of his head and that Ramirez's elbow hit Kyran on his side when he fell on Kyran. Ex. 5 (Alejo dep.) at 86:6-17, 92:11-93:13, Ex. 3 at 14-16. Ramirez told Alejo that Kyran fell five or six more times and that he shook Kyran, smacked his face, and may have been too forceful. Ex. 5 at 86:23-87:25, 113:3-9. Ex. 3 at 19-22, 25-28. Alejo told Ramirez that the injuries to Kyran were inconsistent with Kyran falling and hitting his head, even though he had no basis for that assertion. Ex. 5 at 99:16-102:11. Alejo did not believe Ramirez's version of events, and he told him that "The injuries are not quite the way you are saying," hoping that Ramirez would tell him "the truth." *Id.* at 102:7:11-104:2, 105:20-106:2. Alejo told Ramirez he was lying and threatened, "You better think, think this over real good what you are telling me. Anything else you need to tell me." *Id.* at 104:14-105:19, 106:9-18.

9.    Admit. *See* Ex. 6 (2/2/03 Ramirez interview tr.); Ex. 7 (2/2/03 Ramirez written statement); Ex. 5 at 172:2-173:15. Ramirez admitted smoking marijuana and drinking beer. Ex. 6 at 3-4, 9-10; *see also* Ex. 5 at 84:14-19, 85:13-86:5, 149:2-11, 158:20-23.

10. Admit.

11. Admit. *See* Ex. 8 (Tuggle's notes). Ramirez repeated that Kyran fell and hit his head but claimed that he did not think Kyran hit the ground hard enough to be hurt. Ex. 9 (Tuggle dep.) at 132:25-135:10, 139:24-140:13; Ex. 8 at DHS 40-41. Ramirez said that he was upset because Plaintiff had not asked about what was going on with him. Ex. 8 at DHS 40.

2

12. Admit.

13. Admit. Alejo planned ahead of time to interview Plaintiff, but he did not bring a tape recorder even though it was his practice to record interviews. Ex. 5 at 223:21-24, 226:9-14.

14. Deny. During Alejo's interrogation of her on February 4, 2003, Plaintiff told Alejo that Kyran had woken up in the middle of the night and demonstrated jostling him 6 inches across two to three times. She did not say that she had shaken Kyran. Ex. 1 at 169:6-23, 171:13-18, 172:13-15, 175:20-181:21, 182:9-18. Alejo told her to write a statement, even though she did not want to, and he told her what to write. *Id.* at 183:20-184:2. Alejo told Plaintiff to stay there and keep writing; he was between her and the door. *Id.* at 175:12-15, 184:15-19, 185:4-13, 186:19-23. Alejo made sure that she wrote, "I later awoke from a little sleep angry at Kyran." *Id.* at 189:13-190:4. Alejo also told Plaintiff to write that she shook Kyran more violently than she meant to and that "In looking back, he'd already been hurt." *Id.* at 190:5-11. Alejo convinced Plaintiff that she started or added to Kyran's trauma. *Id.* at 190:12-19. *See also id.* at 212:13-17; Ex. 2 at 1064:1-1066:3, 1066:15-1067:9. Admit that Plaintiff was not formally arrested on February 4, 2003. State further that when Alejo interrogated Plaintiff on February 4, he did not read her her *Miranda* rights, even though he thought she was a suspect. Ex. 1 at 175:6-9; Ex. 5 at 225:16-25, 254:12-21. It was just Alejo and Plaintiff in the room. Ex. 5 at 228:7-10.

15. Deny. After Plaintiff's interrogation, Tuggle spoke with Plaintiff and Damien Gaston in a room with Alejo. Shortly after, Alejo asked Gaston to leave, and he did. After Gaston left, Alejo closed the door and continued interrogating Plaintiff and telling her that she was not telling the truth. He repeatedly accused her of slamming Kyran against a wall or the floor, which she denied repeatedly. At one point, Plaintiff reached over to Tuggle and demonstrated the pressure that she

used to rub Kyran's tummy and stated that she did not think she rubbed Kyran's tummy too hard. Ex. 1 at 194:2-199:22; Ex. 10 (Gaston dep.) at 43:2-15, 45:12-14, 46:17-24, 101:20-102:10. Plaintiff does not remember Tuggle taking notes. Ex. 1 at 200:2-10; *see also id.* at 213:6-9.

16. Admit. Ramirez changed his story after spending three nights in jail, telling Tuggle that he had "[l]ots of time to think about it in jail." Ex. 8 at DHS 40.

17. – 19. Admit.

20. Object that these facts are not material because a vacated judgment (the conviction) has no collateral estoppel effect. Without waiving said objection, admit.

21. Deny that Plaintiff testified that the words were "hers." Plaintiff testified at trial that Alejo told her to write in specific inculpatory phrases in her statement. Ex. 2 at 1065:10-1066:3, 1066:15-1067:9. Admit the rest. *See* Ex. 11 (Alejo trial testimony) at 661:19-663:5.

22. Admit.

23. – 24. Object these facts are not material (see below). Without waiving said objections, admit.

**Plaintiff's Additional Statement of Material Facts ("ASOF")**

1. Kyran Gaston Voss was healthy when Plaintiff put him to bed on the evening of January 30, 2003. Ex. 1 at 86:25-88:2.

2. Kyran was a little fussy. Ex. 1 at 90:10-91:9. Plaintiff rubbed Kyran's tummy. *Id.* at 91:24-92:16; Ex. 10 at 81:13-82:21, 83:15-84:8. Plaintiff asked her husband to help. Gaston took Kyran to his side of the bed and Kyran went back to sleep. Ex. 1 at 97:13-24.

4

3. The next morning was normal; Gaston observed Kyran sleeping normally before he left for work. Ex. 10 at 85:23-86:7. Kyran woke up, had a diaper change, ate a banana, played and then ate a second breakfast a couple hours later. Ex. 1 at 100:11-18, 102:20-22.

4. Plaintiff put Kyran down for a nap by about 12:30 p.m. Ex. 1 at 103:16-104:11, 107:15-17. There was nothing unusual about Kyran when Plaintiff left for work. *Id.* at 106:5-7.

5. About a half hour after Plaintiff arrived at work, Ramirez called her. Ex. 1 at 111:1-3. Sounding panicked, Ramirez said, "I need you to come home now." *Id.* at 111:20-25.

6. When she arrived home, Ramirez was sitting on the front porch with Kyran, who was wrapped in a blanket and dressed in different clothes. Ex. 1 at 113:17-22. One of Kyran's pupils was really big, the other was small, and he was limp and barely conscious. *Id.* at 114:10-115:1.

7. Ramirez told Plaintiff that he had taken Kyran outside after he woke up from his nap. Ramirez said that he stumbled while walking around outside with Kyran on his shoulders, and Kyran fell off his shoulders. Ex. 1 at 116:2-11.

8. Kyran's injuries were consistent with the fall described by Ramirez. Ex. 12 (Monson report); Ex. 13 (Ophoven declaration); Ex. 14 (Borchert declaration). The injuries were unlikely to have resulted from shaking and mattress impact. Ex. 12 at 5; *see also* Ex. 15 (Scheller report).

9. Plaintiff went to Children's Hospital in Denver on January 31, 2003 and stayed there until she was arrested on February 5, 2003. Ex. 1 at 155:4-16. She left only once or twice during that time to shower at a friend's house. *Id.* at 155:12-16.

10. On the evenings of January 31 through February 3, 2003, Plaintiff did not have a place where she could sleep other than on a chair in Kyran's room or in the family room across the hall. She did not sleep well. Ex. 1 at 156:7-157:2. *See also* Ex. 10 at 92:1-93:6.

5

11. During this time, Kyran was on the edge of death. Ex. 1 at 156:4-7. Nurses told Plaintiff that they weren't sure Kyran was going to live. *Id.* at 162:10-14.

12. When Plaintiff described to Alejo how Kyran was the night of January 30, 2003, Alejo kept saying, "You're not telling me everything. Repeat it again; tell me again." Ex. 1 at 176:22-177:4. Alejo accused her of causing Kyran's bruises. Plaintiff told him that those bruises were not there when she dressed him that morning. *Id.* at 177:4-11. Alejo kept asking her the same questions over and over again, accusing her of shaking Kyran. *Id.* at 177:8-16.

13. After Plaintiff demonstrated jostling Kyran back and forth 6 inches across, two to three times, Alejo accused her of causing Kyran's injuries. Ex. 1 at 178:17-20.

14. Jostling and being moved from one side of the bed to another could not have caused Kyran's injuries. Ex. 16 (Wells dep.) at 49:23-50:8.

15. Alejo then wrote down on a piece of paper the words "homicide" and "accident" and told her, "Now, I hate to have somebody go to prison for homicide when it was really an accident." Ex. 1 at 178:25-179:4. Alejo told Plaintiff that she caused Kyran's injuries. Plaintiff told Alejo that Kyran was normal the next day. Alejo instructed her to write down certain things in her statement. He told her, "Now, I want you to make sure to say that you woke up in the middle of the night, at some point, angry with Kyran and that you shook him more violently than you meant to." *Id.* at 180:3-6. After Plaintiff wrote the statement, Alejo read it and told her to add, "In looking back, he was already hurt," despite the fact that she told him again that Kyran was not hurt when she left for work. *Id.* at 180:12-16.

16. Plaintiff was "out of her mind" during this interrogation. Ex. 1 at 179:17; Ex. 10 at 33:1-23 (describing Plaintiff as looking like she was "out of it" after the interrogation and

"[e]motionally crushed … staring off, staring at the floor, staring off into space … babbling on about something that I didn't understand …"). Afterwards, Alejo had to help her walk forward and she broken down crying and sobbing. Ex. 10 at 35:12-18, 107:2-13.

17. During the interrogation, Plaintiff thought:

> how was I going to get out of the room if I didn't do what the cop told me. I didn't know about interrogations. … I had never spoken to a police officer before in my life. … I didn't clearly remember what was written in that statement until I got to see it after I had been arrested. It was a mere wisp of reality in my memory after that point until I got to read it. And I don't know how I was convinced to write that statement. And it's so vague. It's not even really truthful as to how it really was, but it sounds terrible compared to the reality. But that's what he got. And after he got his statement. Then he took me back down to Kyran's room to Damien.

Ex. 1 at 180:17-181:6. *See also* Ex. 17 (Davis report) at 28-39 (describing risk factors that enhance the risk of false confession that were present in this case).

18. Alejo agrees that if he told a witness what to write in a statement, it would be fabricating evidence. Ex. 5 at 250:12-18.

19. Alejo's report contained false statements about what Plaintiff told him during the interrogation. Ex. 5 at 234:6-236:12; Ex. 18 (Alejo report) at 6-7; Ex. 1 at 176:18-181:21, 189:13-190:11.

20. Plaintiff's interrogation by Alejo lasted about 90 minutes. Ex. 1 at 186:17-18.

21. Alejo developed a theory that Plaintiff shook Kyran and then developed evidence that fit that theory, in the form of Plaintiff's written statement obtained on February 4, 2003 and Ramirez's third statement, taken on February 5, 2003. Ex. 5 at 279:5-14.

22. Alejo knew that Plaintiff's written statement, his report, and Ramirez's statements would be submitted to the district attorney to determine what charges to make. Ex. 5 at 251:22-25,

7

279:15-19. Alejo brought Plaintiff's written statement to the prosecutor before he obtained the arrest warrant. *Id.* at 282:12-284:6.

23. Alejo prepared an arrest warrant affidavit for Plaintiff's arrest. Ex. 5 at 280:22-281:5; Ex. 19 (Arrest warrant affidavit). Alejo falsely stated that Plaintiff shook Kyran violently. Ex. 19 ¶ 8.

24. Alejo would not have arrested Plaintiff based solely on Dr. Wells's opinion that Kyran had been shaken. Alejo admits that he would not have arrested Plaintiff without her purported statement that she had violently shaken Kyran the night before. Ex. 5 at 287:2-288:13.

25. Gaston wakes up easily. Ex. 10 at 105:21-23. If Plaintiff had shaken Kyran violently and slammed him on the mattress, he would have woken up. It did not occur. *Id.* at 105:3-15.

26. Alejo admits that it is important to record interviews, especially with serious crimes, so that there is objective proof of what the person said. Ex. 5 at 31:12-32:14.

27. On January 31, 2003, when Alejo spoke to Ramirez on the phone while at the hospital in Alamosa, Alejo told Ramirez to get back to the sheriff's office or hospital so he could talk to him. Ramirez's response was, "What's going to happen to me?" Ex. 5 at 73: 7-21. Ramirez was yelling, excited, and crying. *Id.* at 74:13-22. Ramirez was a nervous wreck. Ex. 20 (Ramirez dep.) at 67:7-9; *see also id.* at 14:3-22, 59:15-17.

28. Alejo received no training on how to investigate a child abuse case. Ex. 5 at 58:8-17.

29. Tuggle wrote a note to herself that said, "Don't necessarily need no contact unless imperative to force confession from parents." Ex. 9 at 84:25-85:15, 86:14-25; Ex. 8 at DHS 36.

30. Tuggle's notes and report, which she knew might become evidence in the criminal case, documented that Plaintiff purportedly admitted shaking Kyran really hard, slammed him on the

bed, rubbed his stomach too hard, and made marks on his chest, even though Plaintiff did not say any of this during the interview. Ex. 1 at 198:12-199:9; Ex. 9 at 165:11-23, 200:11-21; Dkt. 41-2.

31. Ramirez was offered a plea in exchange for testifying against Plaintiff. After Ramirez changed his story, his felony child abuse charge was reduced to a lesser charge. Ex. 20 at 24:1-25:15, 201:3-202:7.

32. Plaintiff's criminal charges were dismissed on September 12, 2017. Ex. 21 (Order).

## ARGUMENT

### I.  Defendants Have Forfeited Any Argument For Dismissal Of Plaintiff's Fourteenth Amendment Due Process Fabrication Of Evidence Claim.

Plaintiff alleges that Defendants fabricated evidence against her in violation of her Fourteenth Amendment due process rights. Dkt. 1 ¶¶ 80-89, 97, 101, 142, 145. As outlined above, there is a genuine dispute of material fact over whether Alejo fabricated Plaintiff's false handwritten statement and Tuggle fabricated her notes claiming that Plaintiff admitted to slamming K.G. on a mattress and violently shaking him. This evidence was used to deprive Plaintiff of liberty, in violation of her Fourteenth Amendment due process rights. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Pierce v. Gilchrist*, 359 F.3d 1279, 1285 (10th Cir. 2004) (recognizing a "Fourteenth Amendment right not to be deprived of liberty without due process of law, … as the result of the fabrication of evidence by a government officer acting in an investigative capacity."); *Spencer v. Peters*, 857 F.3d 789, 793 (9th Cir. 2017); *Avery v. City of Milwaukee*, 847 F.3d 433, 439-40 (7th Cir. 2017); *Castellano v. Fragozo*, 352 F.3d 939, 955 (5th Cir. 2003) (*en banc*). Not only was the written statement that Alejo fabricated introduced against Plaintiff at trial, thereby resulting in Plaintiff's conviction and ensuing decade of wrongful incarceration, but Alejo admits that without it, Plaintiff never even would have been arrested.

Defendants fail to discuss Plaintiff's fabrication claim in their motion. This constitutes forfeiture of any argument for dismissal of this claim. *See Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1209-10 (10th Cir. 2006).

### II. Collateral Estoppel Does Not Bar Plaintiff's Claims Because There Is No Final Judgment To Be Asserted Against Plaintiff.

Defendants seek dismissal of all of Plaintiff's claims through the application of collateral estoppel (which applies to *issues*), even though not all of Plaintiff's *claims* were litigated in her prior criminal proceedings. The premise of Defendants' argument is that the issue of the voluntariness of Plaintiff's confession is the basis of all her claims in this lawsuit, and that, therefore, all of her claims were already litigated and must be dismissed. This premise is wrong. The issue of voluntariness only goes to Plaintiff's Fifth Amendment claim that her right against self-incrimination was violated. Plaintiff has alleged other constitutional claims (e.g., fabrication of evidence, deprivation of liberty without probable cause, Dkt. 1 ¶¶ 128-148), none of which turns on the voluntariness of her statement. Thus, even putting aside the fact that the judgment in Plaintiff's criminal case was vacated, Defendants cannot obtain dismissal of all of Plaintiff's claims on the basis that one issue—voluntariness—was litigated during her criminal case.

#### A. Plaintiff's conviction was vacated and vacated judgments have no preclusive effect.

Once a judgment has been vacated, that judgment, and the findings contained therein, has no preclusive effect. *United States v. Lacey,* 982 F.2d 410, 412 (10th Cir.1992) (judgment has no preclusive effect, for res judicata and collateral estoppel purposes, if it has been vacated, reversed or set aside); *In re Hedged-Investments Associates, Inc.*, 48 F.3d 470, 472-73 (10th Cir. 1995); *United States v. Sackett*, 114 F.3d 1050, 1052 (10th Cir. 1997). "'[A] vacated judgment, by definition, cannot have any preclusive effect in subsequent litigation.'" *Kogut v. County of*

*Nassau*, 2009 WL 5033937, at \*10 (E.D.N.Y. Dec. 11, 2009) (quoting *Boston Firefighters Union v. Boston Police Patrolmen's Ass'n*, 468 U.S. 1206, 1211 (1984)); *see also Peterson v. Heymes*, 931 F.3d 546, 554 (6th Cir. 2019); *Evans v. Katalinic*, 445 F.3d 953, 955-56 (7th Cir. 2006) (referring to the collateral estoppel argument advanced here as "absurd"); *United States v. Lawson*, 736 F.2d 835, 837 (2d Cir. 1984) (citing *United States v. Ayres*, 76 U.S. 608, 610 (1869)); *Tankleff v. County of Suffolk*, 2010 WL 5341929, at \*5 (E.D.N.Y. Dec. 21, 2010). Plaintiff's criminal conviction was vacated. As a result, this judgment cannot have preclusive effect. The judgment is not—and cannot be—final; it no longer exists at all.

Relevant Supreme Court authority only contemplates the application of collateral estoppel where there is an extant state-court judgment. Through the Full Faith and Credit Act, 28 U.S.C. § 1738, "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Allen v. McCurry*, 449 U.S. 90, 96 (1980); *see also Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 77 n.1 (1984); *Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008); *Southern Pac. R. Co. v. United States*, 168 U.S. 1 (1897) (issue preclusion is available only if "the judgment in the first suit remains unmodified"). Thus, collateral estoppel cannot apply if there is no final state-court judgment. In this case, the lack of an extant state-court judgment places this outside the realm of collateral estoppel and cannot preclude Plaintiff's claims.

## B. Even under Colorado law, issue preclusion does not bar relitigation of the voluntariness of Plaintiff's confession.

Even if the Court were to find that *Allen* and § 1738 apply in the absence of a final judgment, Colorado law would not bar relitigation of the voluntariness of Plaintiff's confession. First, there must be a "final judgment on the merits in the prior proceeding." *Rantz v. Kaufman*, 109 P.3d

11

132, 139 (Colo. 2005) (*en banc*). In order for the state court ruling on Plaintiff's motion to suppress to have any preclusive effect, there must be a final judgment on the merits that can be asserted against Plaintiff. There is no final judgment here because Plaintiff's conviction was vacated. *Williams v. Henderson*, 626 F. App'x 761, 765 (10th Cir. 2015).

Second, the only issue "actually litigated" in Plaintiff's criminal proceedings was the voluntariness of her confession. As discussed above, the voluntariness of Plaintiff's confession is only a part of her Fifth Amendment claim, not her Fourteenth Amendment claim for fabrication of evidence in violation of due process, or her Fourth Amendment claim for deprivation of liberty without probable cause. *See Pierce*, 359 F.3d at 1285 (describing fabrication of evidence claim); *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008) (describing Fourth Amendment malicious prosecution claim); *Griffin v. Strong*, 983 F.2d 1540, 1543 (10th Cir. 1993) (describing Fifth Amendment claim for involuntary self-incrimination). Defendants have not met their burden of establishing that any of the other issues raised by Plaintiff in this case were actually and necessarily litigated and decided against her in a prior case. *See Williams*, 626 F. App'x at 764. None of the issues surrounding Plaintiff's Fourth or Fourteenth Amendment claims were actually litigated or necessary to the determination of her guilt in the criminal case.

The unpublished, out-of-Circuit cases cited by Defendants do not support their argument. *Hatchett v. City of Detroit*, 495 F. App'x 567 (6th Cir. 2010) (unpublished), was rejected by the Sixth Circuit in *Peterson*, 931 F.3d at 554. And *Ruether v. Allen*, 998 F.2d 1018 (8th Cir. 1993) (unpublished), is inapposite because the state-court criminal conviction remained intact.

Finally, even if there were a preclusive judgment in place from state-court proceedings and the Defendants had met their burden to establish the elements discussed above, issue preclusion

12

would still be inapplicable here. Issue preclusion is an equitable doctrine grounded in notions of fundamental fairness. "Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Montana v. United States*, 440 U.S. 147, 164 n.11 (1979). Plaintiff alleges in this case that Defendants' misconduct rendered her criminal proceedings a farce. The decisions reached during those proceedings were premised on false, fabricated evidence. Those decisions cannot be the basis for issue preclusion. *See Awabdy v. City of Adelanto*, 368 F.3d 1062, 1068 (9th Cir. 2004); *Evans*, 445 F.3d at 956.

### III.    Defendants Alejo And Tuggle Are Not Entitled To Absolute Immunity.

Defendants argue that Plaintiff's claims are predicated on Alejo and Tuggle's testimony in the criminal proceedings. Dkt. 40 at 9-10. This fundamentally misunderstands Plaintiff's claims. Plaintiff alleges that Defendant's conspired and fabricated evidence which they then used against her during her prosecution and at trial, which resulted in her deprivation of liberty. "'Law enforcement officials who falsify affidavits and fabricate evidence' receive only qualified immunity—even if they are also witnesses." *Montoya v. Vigil*, 898 F.3d 1056, 1070 (10th Cir. 2018) (quoting *Rehberg v. Paulk*, 566 U.S. 356 (2012); citing *Vogt v. City of Hays*, 844 F.3d 1235 (10th Cir. 2017)). *See also Bledsoe v. Vanderbilt,* 934 F.3d 1112, 1117 (10th Cir. 2019); *Avery*, 847 F.3d at 441 ("If an officer who fabricates evidence can immunize himself from liability by authenticating falsified documentary or physical evidence and then repeating the false 'facts' in his trial testimony, wrongful-conviction claims premised on evidence fabrication would be a dead letter."); *Buckley v. Fitzsimmons*, 509 U.S. 259, 275-76 (1993).

Here, Plaintiff does not challenge the testimony of the Defendants but challenges their pre-trial actions of fabricating her statements, which were then used against her in her criminal case.

13

*See* Resp. DSOF ¶¶ 14-15, 21; ASOF ¶¶ 15-16, 18-19, 30. Specifically, Plaintiff alleges that the Alejo fabricated inculpatory statements in her written "confession" and that Tuggle fabricated her notes claiming that Plaintiff admitted to violently shaking and slamming Kyran. *Id.*

**IV.    Defendants Tuggle And County Are Not Entitled To Statutory Immunity.**

C.R.S. § 19-3-309 has exclusively been applied as a defense to state tort claims. *See Starkey v. Boulder Cty. Soc. Servs.*, 2006 WL 8073690, at *8 (D. Colo. Nov. 21, 2006) (applying statutory immunity only to state law claims while applying qualified immunity to Plaintiff's § 1983 claim). Defendants Tuggle and County have cited no cases applying this statutory immunity to federal claims; therefore, they have not met their burden of showing that this statutory immunity applies to Plaintiff's federal claims.

Even if this statutory immunity were to apply to federal claims, there is a genuine dispute of material fact over whether Tuggle fabricated her report. Plaintiff says that she denied slamming Kyran against a wall or floor and that she did not say that she shook him. Tuggle wrote the opposite in her notes and report. Resp. to DSOF ¶ 15; Dkt. 41-2 at 2; ASOF ¶ 30. When deciding whether good faith exists, all underlying circumstances must be examined. *Montoya By & Through Montoya v. Bebensee*, 761 P.2d 285, 290 (Colo. App. 1988). Proof of such state of mind involves a consideration of circumstantial evidence and of the reasonable inferences to be drawn therefrom. *Id.* Thus, such an issue seldom can be resolved on a motion for summary judgment. *Hatfield v. Barnes,* 168 P.2d 552, 553 (Colo. 1946) (*en banc*). Moreover, if a plaintiff's pleadings and affidavits assert facts which, if true, would rebut the statutory presumption of good faith then summary judgment is improper. *Martin v. Weld County,* 598 P.2d 532, 535 (Colo. App. Ct. 1979). Tuggle's actions of writing down inculpatory statements by Plaintiff in her notes when

14

Plaintiff said the opposite during the interview would rebut the good faith presumption and statutory immunity would not be applicable in this case. *See id.* (holding that the good faith presumption did not apply when defendants published 'slanderous' accusation in their report).

**V.   Defendants Alejo And Tuggle Are Not Entitled To Qualified Immunity.**

   **A. Tuggle is not entitled to qualified immunity on Plaintiff's Fourteenth Amendment fabrication of evidence claim.**

   **1.   Tuggle personally participated in fabricating her notes and report.**

Defendant Tuggle's argument that she did not personally participate in any constitutional violation (Dkt. 40 at 11-12) ignores the evidence that she fabricated inculpatory evidence (her report, her notes), which was used to deprive Plaintiff of liberty during the criminal prosecution. The fact that Tuggle did not "initiate" or "prosecute" criminal charges is irrelevant. Tuggle personally participated in depriving Plaintiff of liberty in violation of her due process rights under the Fourteenth Amendment by fabricating inculpatory statements attributed to Plaintiff in her report and notes. *See* Resp. to DSOF ¶ 15; Dkt. 41-2 at 2; ASOF ¶ 30. This evidence was used to falsely arrest, maliciously prosecute, and wrongfully convict Plaintiff, depriving her of liberty in violation of her constitutional rights.

Tuggle attempts to get around the disputed material facts by framing Plaintiff's fabrication allegation as "not accurately report[ing]" what Plaintiff said. *See* Dkt. 40 at 12. This merely disputes Plaintiff's factual account and views the facts in Tuggle's favor, which is impermissible at summary judgment.

   **2.   The law was clearly established in 2003 that Tuggle could not fabricate evidence.**

When determining whether the law is clearly established there "need not be a case precisely on point." *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018). "[T]he salient question ...

15

is whether the state of the law ... gave [the defendants] fair warning that their alleged treatment of [the plaintiffs] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

In the Tenth Circuit, courts have held on multiple occasions that "social services workers who assisted or acquiesced in the use of false information" to violate Plaintiff's constitutional rights were not entitled to qualified immunity. *See Malik v. Arapahoe Cty. Dep't of Soc. Servs.,* 987 F. Supp. 868, 872 (D. Colo. 1997), *aff'd*, 191 F.3d 1306 (10th Cir. 1999); *Snell v. Tunnell*, 920 F.2d 673 (10th Cir. 1990) ("We conclude that even in the context of a child abuse investigation, a reasonable public official would have known that using known false information to secure an order to justify entry and search of a private home would violate the fourth amendment's proscription on unreasonable searches and seizures"); *Pierce,* 359 F.3d at 1298 ("No one could doubt that the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986, in the context of information supplied to support a warrant for arrest"). Tuggle's conduct falls well within clearly established law. Defendant assisted in the fabrication of notes and a report that deprived Plaintiff of liberty. It is well established that a government official cannot fabricate inculpatory evidence.

**B. Alejo is not entitled to qualified immunity on Plaintiff's Fourth, Fifth or Fourteenth Amendment claims.**

**1. Fabrication of evidence in violation of Fourteenth Amendment due process**

It has been clearly established since long before 2003 that a government official may not fabricate evidence to deprive a criminal defendant of liberty without due process of law. *Pierce*, 359 F.3d at 1299 (deliberate or reckless falsification or omission of evidence was a constitutional violation long before 1986); *Pyle v. Kansas*, 317 U.S. 213, 216 (1942); *Mooney v. Holohan*, 294

U.S. 103, 112 (1935); *see also Spurlock v. Satterfield*, 167 F.3d 995, 1005-06 (6th Cir. 1999).

Alejo makes no argument otherwise.

There is a genuine dispute of material fact: Plaintiff says that Alejo told her to write inculpatory statements in her "confession"; namely, that she violently shook Kyran, she was angry at him, and that "[i]n looking back, he was already hurt." Alejo denies this. Without those statements, Plaintiff's "confession" was not inculpatory. With those statements, Plaintiff's confession caused her arrest, detention, prosecution, conviction, and subsequent 10 years in prison before she was exonerated. Alejo notably fails to address Plaintiff's fabrication claim in his motion. Any argument for dismissal of that claim has been forfeited.

Alejo makes a vague, one-sentence assertion that "[s]tate tort remedies meet the procedural requirements to the Due Process Clause and so Plaintiff suffered no deprivation of liberty in violation of her procedural due process rights." Dkt. 40 at 14. Even if this argument were not so undeveloped as to be waived, it has no merit. Due process claims arising from the fundamental fairness of a criminal trial are "beyond the reach of *Parratt* [*v. Taylor*, 451 U.S. 527 (1981)]." *Armstrong v. Daily*, 786 F.3d 529, 540 (7th Cir. 2015); *see also id.* at 539-46. As explained in *Avery*, *Albright v. Oliver*, 510 U.S. 266 (1994), and *Parratt* have:

> nothing at all to say about a deprivation of the due-process right to a fair trial. That is, *Albright* did not involve a plaintiff who claimed he was wrongfully *convicted* of a crime in a trial tainted by falsified evidence, known perjury, or the deliberate destruction of exculpatory evidence. … The availability of a state-law remedy for malicious prosecution doesn't defeat a federal due-process claim against an officer who fabricates evidence that is later used to obtain a wrongful conviction.

847 F.3d at 440-41. *See also Castellano*, 352 F.3d at 962; *Pierce*, 359 F.3d at 1286. The case cited by Defendants, *Becker v. Kroll*, 494 F.3d 904 (10th Cir. 2007), does not hold otherwise; that case did not involve a plaintiff who was wrongfully convicted after an unfair trial.

17

### 2.    Fifth Amendment involuntary and coerced confession

For more than a century it has been clear that criminal defendants may not be prosecuted with statements coerced by police. *Brown v. Mississippi*, 297 U.S. 278 (1936); *Bram v. United States*, 168 U.S. 532, 542 (1897); *see also Blackburn v. Alabama*, 361 U.S. 199, 205 (1960). The Constitution requires any confession be "made freely, voluntarily, and without compulsion or inducement of any sort." *Haynes v. Washington*, 373 U.S. 503, 513 (1963) (internal quotation marks and citation omitted); *Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1978). Courts must consider the "totality of all the surrounding circumstances." *Schneckloth*, 412 U.S. at 226. Involuntariness is not limited to physical abuse or other "inherently coercive" tactics. *Miller v. Fenton*, 474 U.S. 104, 110 (1985). Accordingly, "law enforcement conduct which renders a confession involuntary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will. Subtle psychological coercion suffices as well, and at times more effectively, to overbear 'a rational intellect and a free will.'" *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981) (quoting *Blackburn*, 361 U.S. at 208). The court's ultimate inquiry is whether "the officers took 'unfair advantage of [the] defendant's traits or the surrounding circumstances.'" *United States v. Guerro*, 983 F.2d 1001, 1004 (10th Cir. 1993).

Alejo does not, and could not, contest this established law. Instead, he argues that his interview of Plaintiff at the hospital was not custodial for *Miranda* purposes. Dkt. 40 at 16. This argument is so undeveloped that it should be deemed waived. Moreover, it is unclear what this has to do with Plaintiff's Fifth Amendment claim. Whether a suspect was advised of his constitutional rights is only a factor in analyzing the totality of the circumstances in considering a Fifth Amendment claim. *See United States v. Williams*, 576 F.3d 1149, 1162 (10th Cir. 2009).

18

Alejo's argument that there is no evidence of a constitutional violation is based on viewing the evidence in his favor. *See* Dkt. 40 at 13. A reasonable jury could conclude that her "confession" was involuntary because she had not slept for four days; she was overcome with grief given that her son was on the "edge of death"; Alejo did not give her *Miranda* warnings; Alejo repeatedly challenged her denials and would not accept her answers as the truth; he blocked her exit from the room and told her at one point to keep writing and not to leave. Resp. DSOF ¶ 14; ASOF ¶¶ 9-13, 15-17. At one point, he manipulated her by writing on a piece of paper the words "accident" and "homicide," telling her, "I hate to have somebody go to prison for homicide when it was really an accident." ASOF ¶ 15. *See United States v. Lopez*, 437 F.3d 1059, 1064 (10th Cir. 2006) (affirming district court's finding that the agent's use of pieces of paper marked "murder" and "mistake" with different amounts of time in prison was a promise of leniency and was "[t]he most troublesome detail about the interrogation"). Viewing the facts and all reasonable inferences therefrom in Plaintiff's favor, a jury could find that Plaintiff's will was overborne by Alejo repeatedly pressuring her and twisting facts to fit his fabricated narrative. *See United States v. Bundy*, 966 F. Supp. 2d 1180, 1182 (D.N.M. 2013) (a subject who was under emotional distress from a tragic accident, was fearful of losing her children, and was questioned in a confrontational manner by an officer who failed to record the interview gave an involuntary confession under totality of circumstances).

### 3. Fourth Amendment deprivation of liberty without probable cause

Plaintiff alleges that Alejo violated her Fourth Amendment not to be detained or deprived of liberty without probable cause. *See Pierce*, 359 F.3d at 1285-86 ("[t]he initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial,

constitutional analysis shifts to the Due Process Clause"); *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017); *Wilkins v. DeReyes*, 528 F.3d 790, 798 (10th Cir. 2008). There is sufficient evidence for a jury to conclude that Plaintiff was deprived of liberty without probable cause. *See* ASOF ¶ 24.

Alejo's only argument against Plaintiff's Fourth Amendment claim is that "her claim accrued when the unconstitutional action occurred on February 5, 2003." Dkt. 40 at 13. This is wrong. Alejo obtained Plaintiff's arrest with a warrant which contained falsehoods about Plaintiff's supposed inculpatory statements. ASOF ¶¶ 22-23. Plaintiff's Fourth Amendment malicious prosecution claim did not accrue until the favorable termination of Plaintiff's criminal proceedings on September 12, 2017. *Myers v. Koopman*, 738 F.3d 1190, 1193-95 (10th Cir. 2013); *Heck v. Humphrey*, 512 U.S. 477, 489 (1994); ASOF ¶ 21.[2] Plaintiff filed suit on June 4, 2018, within two years of that date.

## CONCLUSION

Defendants' motion to dismiss Plaintiff's Fourteenth Amendment fabrication of evidence claims against Tuggle and Alejo, Fourth Amendment claim against Alejo, and Fifth Amendment claim against Alejo should be denied. (Plaintiff does not oppose dismissal of Counts IV, V, VI, VII, VIII, IX, or X. If Plaintiff's indemnification claim (Count XI) is dismissed, it should only be without prejudice as unripe until there is a judgment.)[3]

---

[2] Plaintiff's fabrication of evidence claim did not accrue until favorable termination, either. *McDonough v. Smith*, 139 S. Ct. 2149, 2156 (2019).

[3] Defendants make a conclusory assertion that they are entitled to costs and fees for dismissal of state law claims under C.R.C.P. 12(b). Dkt. 40 at 20. But this action is not pending in state court or under the Colorado Rules of Civil Procedure—much less subject to dismissal under C.R.C.P. 12(b) (or Fed. R. Civ. P. 12(b), for that matter). *See Lewis v. Powers*, 2019 WL 2372697, at *2 (D. Colo. June 5, 2019) (C.R.S. §§ 13-16-113(2) and 13-17-201 only permit awards of attorneys' fees and costs for tort actions properly dismissed pursuant to C.R.C.P. 12(b)).

Respectfully submitted,

/s/ Elizabeth Wang
Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
elizabethw@loevy.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I, Elizabeth Wang, an attorney, certify that on November 4, 2019, I filed the foregoing

Response via CM/ECF, thereby delivering an electronic copy to all counsel of record.


s/ Elizabeth Wang

21