IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 18-cv-01359-RBJ

KRYSTAL O'CONNELL,

    Plaintiff,

v.

HARRY ALEJO, former Alamosa County Sheriff's Office Sergeant,
MARCIA TUGGLE, former caseworker of the Alamosa Department of Human Services,
BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF ALAMOSA, COLORADO, and
ROBERT JACKSON, Sheriff of Alamosa County, Colorado,

    Defendants.

## ORDER

This matter is before the Court on defendants Harry Alejo, Marcia Tuggle, Board of County Commissioners of the County of Alamosa Colorado, and Robert Jackson's motion for summary judgment, ECF No. 40. For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

This case arises from the arrest, prosecution, and conviction of Krystal O'Connell. ECF No. 1. On January 31, 2003 Ms. O'Connell left her young son Kyran in the care of Patrick Ramirez while she went to work at around 1 p.m. *Id*. at 5. Several hours later, Ms. O'Connell and Ramirez took Kyran to an emergency room. *Id*. at 6. Kyran was diagnosed with serious brain injuries and flown by helicopter to Children's Hospital in Denver. ECF No. 40 at 2.

Defendant Harry Alejo was a sergeant with the Alamosa County Sherriff's Office and spoke with Ms. O'Connell and Kyran's father, Damion Gaston, at the Alamosa emergency room before they left for Denver. *Id.* That evening, Alejo interviewed Ramirez at the Alamosa County Sheriff's office about the events. According to Ramirez, Kyran was injured when he fell from Ramirez's shoulders while they were walking outside. *Id.* at 3. Ramirez stated that Kyran hit his head when he fell, and that Ramirez' elbow hit Kyran on his side. ECF No. 52 at 2. Ramirez stated that when Kyran attempted to walk on his own he fell five or six more times. ECF No. 52-6 at 86:3–7. He also stated that he shook Kyran and smacked his face and "was too forceful when I tried to get him to wake up." *Id.* at 113:1–10. Ramirez wrote and signed a statement to that effect. *Id.*

During the interview, Alejo told Ramirez that Kyran's injuries were inconsistent with Kyran falling and hitting his head, though he admits now that he had no basis for this claim. *Id.* at 99:16–100:25. Alejo told Ramirez he believed he was lying, and when Ramirez asserted that he did not hurt Kyran purposely, Alejo told him "you better think this over real good what you are telling me." *Id.* at 105:12–18.

Alejo interviewed Ramirez again on February 2, 2003, and Ramirez reiterated the same version of events. ECF No. 40 at 3. He also admitted to smoking marijuana and drinking beer. ECF No. 52-6 at 3–4, 9–10. At the conclusion of the interview Ramirez was arrested for having caused Kyran's injuries. ECF No. 40 at 3. On February 3, 2003 defendant Marcia Tuggle, a caseworker with the Alamosa County Department of Social Services, interviewed Ramirez in jail, during which Ramirez reiterated the same story. *Id.*

On February 4, 2003 Tuggle and Alejo attended doctors' meetings and interviewed Ms. O'Connell and Gaston. *Id.* Alejo met with Gaston and O'Connell separately but did not record

2

either interview, though he acknowledges it was his practice to record interviews. ECF No. 52 at 3. At the time of the interview, Ms. O'Connell had been staying at Children's hospital for four nights, sleeping in the chair in Kyran's room, and had been told that Kyran might not survive. *Id*. at 5. What Ms. O'Connell admitted during this interview is the subject of dispute, as is the veracity and voluntariness of the statement she wrote and signed at its conclusion. According to her statement Ms. O'Connell "shook [Kyran] 2–3 times, and probably more violently than I meant to." ECF No. 42-1.

Ms. O'Connell alleges that she told Alejo that Kyran was fine the night of January 30th and the morning of January 31st. ECF No. 52 at 6. She claims Alejo accused her of not telling him everything, made her repeat her story, and accused her of causing Kyran's injuries and shaking him, though Ms. O'Connell told him Kyran had no bruises when she dressed him the morning of the 31st. *Id*. She alleges that Alejo wrote down the words "homicide" and "accident" on a piece of paper and stated: "Now, I hate to have somebody go to prison for homicide when it was really an accident." *Id*. She claims that Alejo told her what to write and convinced her that she had contributed to Kyran's injuries, though she told him she never hurt Kyran. ECF No. 52 at 3. Alejo did not arrest Ms. O'Connell at the conclusion of the interview. *Id*.

That same day Tuggle interviewed Ms. O'Connell and Gaston with Alejo present. ECF No. 40 at 4. The substance of this interview is also in dispute. According to Tuggle's report, Ms. O'Connell admitted to shaking Kyran "really hard," and that she "slammed him on the bed." ECF No. 41-2. Ms. O'Connell alleges that during the interview Alejo asked Gaston to leave and then began to interrogate her, accusing her of lying and stating that she slammed Kyran against the wall. ECF No. 52 at 3. Ms. O'Connell denied these accusations and claims she

demonstrated the pressure she used to rub Kyran's stomach, which she believed was not "too hard." *Id*. at 3–4.

On February 5, 2003, after Ramirez had been in jail for three nights, Ramirez recanted his statements. ECF No. 40 at 4. He claimed that he had been covering for O'Connell, and that Kyran had been hurt when he arrived at the house on January 31st. *Id*. Ramirez denies that he was coerced or manipulated into changing his story. *Id*. Later that day Ms. O'Connell was arrested on a warrant that had been issued pursuant to an affidavit filed by Alejo based on his interview with her. ECF 52 at 8.

On March 24, 2003 Kyran died of his injuries. ECF No. 40 at 5.

On January 16, 2004 a motion to suppress hearing was held before Alamosa County District Judge Kuenhold regarding Ms. O'Connell's February 4th statement. *Id*. Judge Kuenhold denied the motion to suppress, concluding that Ms. O'Connell's statements were voluntary and not the product of coercion or promises. *Id*. The statement was introduced as evidence at trial. *Id*. Ms. O'Connell testified, acknowledging she had written the statement but claiming that Alejo had told her to write in specific inculpatory phrases. ECF No. 52 at 4. Ms. O'Connell was convicted of child abuse resulting in death, and her conviction was upheld on appeal. ECF No. 40 at 5–6. Her appeal did not raise the issue of voluntariness. *Id*.

On August 7, 2017 Ms. O'Connell's conviction was overturned based on ineffective assistance of counsel. *Id*. at 6. The reviewing judge concluded that her counsel should have pursued medical evidence that Kyran's injuries were consistent with having fallen from Ramirez's shoulders. *Id*. The district attorney elected not to re-try Ms. O'Connell and moved to dismiss the charges against her. ECF No. 52 at 16. The Alamosa County District Court

dismissed the charges on September 12, 2017. ECF No. 52-21. She now seeks damages from defendants for violating her rights. ECF No. 1.

**STANDARD OF REVIEW**

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Concrete Works of Colo., Inc. v. City and Cty of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

**ANALYSIS**

Defendants move for summary judgment on several grounds, including collateral estoppel, absolute immunity, statutory immunity, and qualified immunity. ECF No. 40. Ms. O'Connell does not oppose the motion regarding counts IV, V, VI, VII, VIII, IX, and X, ECF No. 52 at 20, and therefore summary judgment dismissing those claims is granted. Remaining are Ms. O'Connell's Fifth Amendment claim of false confession (Count I), her Fourth

5

Amendment claim of deprivation of liberty (Count II), and her Fourteenth Amendment claim of fabrication of evidence (Count III).

   A. **Collateral Estoppel**

Federal courts must apply the collateral estoppel rules of the state that rendered the underlying judgment. *Migra v. Warren City Sch. Dist. Bd. of Educ*, 465 U.S. 75, 81 (1984). The parties agree that the elements of collateral estoppel in Colorado are as follows: 1) was the issue decided in the prior adjudication identical to the one presented in the action in question; 2) was there a final judgment on the merits; 3) was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication; and 4) did the party against whom the plea is asserted have a full and fair opportunity to litigate the issue in the prior adjudication? *Pomeroy v. Waitkus*, 517 P.2d 396, 399–400 (Colo. 1973).

The parties disagree on just two issues. First, they disagree about whether there was a final judgment on the merits in the prior adjudication regarding the voluntariness of Ms. O'Connell's confession. Second, assuming there has been a final judgment on the merits regarding voluntariness, the parties disagree about whether all Ms. O'Connell's claims are precluded. According to defendants, the issue of voluntariness underlies all Ms. O'Connell's claims. Ms. O'Connell disagrees, arguing that issue preclusion should preclude at most only her Fifth Amendment claim.

The ruling at issue is Judge Kuenhold's denial of Ms. O'Connell's motion to suppress, based on his finding that her confession was voluntary. Ms. O'Connell points to federal law that bars a vacated conviction from having preclusive effect. *See United States v. Lacey*, 982 F.2d 410, 412 (10th Cir. 1992). She argues that because her ultimate conviction was vacated, the ruling on the motion to suppress cannot have preclusive effect. ECF No. 52 at 10–11.

Defendants claim that Ms. O'Connell's cited federal case law is irrelevant because this Court is bound to apply Colorado law. ECF No. 55 at 2. According to defendants, under Colorado law Ms. O'Connell's vacated conviction did not overturn the judgment of voluntariness made at the motion to suppress hearing. *Id*. Indeed, under Colorado law the judgment at the motion to suppress hearing is its own final judgment on the issue of whether a confession was voluntary. *See Deeds v. People*, 747 P.2d 1266, 1271 (Colo. 1987). The issue then is whether the subsequent vacatur of the conviction also overturns the voluntariness judgment on the motion to suppress.

To support their position that under Colorado law the motion to suppress ruling is not overturned by the conviction's vacatur, defendants, ironically, cite out-of-circuit federal cases. ECF No. 40 at 8. In *Hatchett v. City of Detroit*, the Sixth Circuit found that a plaintiff was collaterally estopped from contesting the voluntariness of his confession even though his motion for a new trial had been granted, and charges were subsequently dropped due to newly discovered DNA evidence. 495 F. App'x 567, 570 (6th Cir. 2012) (unpublished). The court found that although the conviction was no longer in place, "under Michigan law, a determination of voluntariness is separate from a determination of guilt." *Id*. Specifically, the court cited Michigan case law describing a motion to suppress hearing as an independent "pretrial judicial determination of the voluntariness of a criminal defendant's statement." *People v. Manning*, 624 N.W. 2d 746, 750–51 (Mich. Ct. App. 2000). From this, the Sixth Circuit concluded that the question of whether the police officers unconstitutionally coerced the plaintiff was an issue separate from whether the plaintiff was guilty of the crime of which he was convicted. *Hatchett*, 495 F. App'x at 570–71. Therefore, the final determination of voluntariness made at the motion

to suppress hearing was a final judgment on the issue and was not impacted by the subsequent invalidation on unrelated grounds. *Id.* at 571.[1]

The Sixth Circuit visited the issue again in *Peterson v. Heymes*, 931 F.3d 546, 554 (6th Cir. 2019). This time the court upheld the district court's denial of collateral estoppel, finding that a motion to suppress determination on a vacated conviction was not a final judgment. 931 F.3d at 554. Noting that *Hatchett* was an unpublished case, the court distinguished *Hatchett* on the grounds that "it was not clear that the criminal judgment had actually been vacated." *Id*. In *Heymes*, following new DNA evidence precluding the plaintiff's involvement, the conviction was vacated, and a new trial was granted, although the prosecution subsequently dismissed charges. *Id*. at 552. Because the conviction was vacated, "the trial court's interlocutory rulings—including those which the court made at the [motion to suppress] hearing—have merged with the final judgment, which means those interlocutory rulings have been vacated too." *Id*. at 554. Vacated rulings have no preclusive effect under Michigan law, and therefore collateral estoppel did not apply. *Id*.

Ms. O'Connell's conviction was vacated on grounds other than involuntariness, just as in *Heymes*. A new trial was granted, and the state dismissed the charges. One potentially significant difference between *Heymes* and the present case, however, is that in *Heymes* it appears that DNA evidence may have exonerated the defendant, thus apparently rendering the confession false. In the present case the conviction was vacated due to ineffective assistance of

---

[1] Defendants also rely on *Ruether v. Allen*, in which the Eighth Circuit found that collateral estoppel barred plaintiff's § 1983 challenges to the voluntariness of his conviction. 998 F.2d 1018 (8th Cir. 1993). In *Ruether*, the court concluded that the issue of voluntariness had been litigated to final judgment in the plaintiff's unsuccessful state postconviction proceedings. *Id*. The Eighth Circuit's sparse decision in *Ruether* does not provide enough detail to determine whether the facts are directly on point here. For example, I cannot determine from the opinion whether the plaintiff's conviction had been vacated, or whether, despite the vacatur, the court still concluded that the post-conviction proceedings were a final judgment.

8

trial counsel for failure to pursue exculpatory medical evidence.  *See* ECF No. 40 at 6.  However, this particular ineffective assistance of counsel finding calls into question Ms. O'Connell's guilt, and hence the reliability of her confession.

As noted above, under Colorado law, as in Michigan law, a motion to suppress ruling is treated as an independent judgment on the merits of the issue of voluntariness.  This did not stop the *Heymes* court from describing the motion to suppress ruling as an "interlocutory" ruling that subsequently "merged" with the conviction and was vacated along with it.  *Heymes*, 931 F.3d at 554.  Neither party cites Colorado cases that address whether vacated convictions have preclusive effect.

Ms. O'Connell relies on myriad federal cases holding that they do not.  ECF No. 52 at 10–11.  Although these cases do not interpret Colorado law, I am persuaded that a vacated judgment, even if not vacated as a result of evidence exonerating the defendant, should not be given preclusive effect.  *See Lacey*, 982 F.2d at 412 ("A judgment that has been vacated, reversed, or set aside on appeal is thereby deprived of all conclusive effect, both as res judicata and as collateral estoppel."); *Evans v. Katalinic*, 445 F.3d 953, 956 (7th Cir. 2006) (finding that under Illinois law, vacated convictions did not constitute final judgments); *United States v. Lawson*, 736 F.2d 835, 837 (2d Cir. 1984) (finding vacatur placed the parties "in the same situation as if no trial had ever taken place," for the purposes of determining whether an argument had been waived at trial).

Because Ms. O'Connell's conviction was vacated, overturning not only the judgment of guilt but also the interlocutory decisions preceding it, there is no extant final judgment on the merits, and her claims are not precluded.

### B. Absolute Immunity

Defendants claim that both Alejo and Tuggle are entitled to absolutely immunity because "all witnesses—police officers as well as other lay witnesses—are absolutely immune from civil liability under § 1983 based on their testimony in a prior [criminal] trial." *Miller v. Glanz*, 948 F.2d 1562, 1570 (10th Cir. 1991). According to defendants, Ms. O'Connell's claims are predicated on defendants' testimony at her trial, and therefore they are immune from § 1983 actions. ECF No. 40 at 9–10.

As Ms. O'Connell correctly notes, however, this argument misstates the nature of her claims. Ms. O'Connell does not challenge defendants' trial testimony, but rather the evidence they provided prior to trial that resulted in her arrest and prosecution, including Tuggle's notes and report, Alejo's report, his affidavit in support of her arrest warrant, and the statement she alleges he fabricated. Though some of this evidence was used at trial to convict Ms. O'Connell, defendants are not entitled to immunity for claims challenging its veracity. *See Montoya v. Vigil*, 898 F.3d 1056, 1070 (10th Cir. 2018) ("[L]aw enforcement officials who falsify affidavits and fabricate evidence receive only qualified immunity—even if they are also witnesses.") (quoting *Rehberg v. Paulk*, 566 U.S. 356 (2012)) (internal quotations omitted).

### C. Statutory Immunity

Defendants claim that Tuggle is entitled to statutory immunity under C.R.S. §19-3-309, which protects those who report child abuse in good faith in performance of their duties. ECF No. 40 at 10. Ms. O'Connell argues that § 19-3-309 does not apply to § 1983 claims. ECF No. 52 at 14.

Ms. O'Connell is correct that a Colorado statute cannot grant immunity to officials sued under federal law without violating the supremacy clause. "Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 . . . cannot be immunized by state law. A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise." *Martinez v. State of Cal.*, 444 U.S. 277, 284 n.8 (1980) (quoting *Hampton v. Chicago*, 484 F.2d 602, 607 (7th Cir. 1973). Therefore, the immunities granted in § 19-3-309 do not immunize Tuggle, who is sued under § 1983.

### D. **Qualified Immunity**

Defendants argue that qualified immunity bars all remaining claims against them. ECF No. 40 at 11–14. Qualified immunity protects government officials acting in their individual capacity so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When qualified immunity is asserted by an official, a plaintiff must satisfy the burden of showing (1) that the defendant violated a constitutional right (2) that was clearly established at the time of violation. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A reviewing court has discretion to address either prong first. *See Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)) (internal quotations omitted). "A plaintiff may show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the

alleged violation." *Ali v. Duboise*, 763 F. App'x 645, 650 (10th Cir. 2019) (unpublished) (citing *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017)) (internal quotations omitted). "[C]learly established law should not be defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)) (internal quotations omitted). "Although a plaintiff need not identify a case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate." *Ali*, 763 F. App'x at 650 (citing *Mullenix*, 136 S. Ct. at 308) (internal quotations omitted); *see also White*, 137 S. Ct. at 551.

Ms. O'Connell alleges that defendants violated her Fifth Amendment right against self-incrimination, her Fourth Amendment right against deprivation of liberty without probable cause, and her Fourteenth Amendment right to due process. ECF No. 1. I examine whether defendants are entitled to qualified immunity for each of these claims.

1. <u>Fifth Amendment</u>

Ms. O'Connell alleges that Alejo and Tuggle conducted an unconstitutional investigation that overbore her will and resulted in a coerced and false confession, violating her Fifth Amendment right against self-incrimination. ECF No. 1 at 19. The circumstances of the first interrogation was as follows: Ms. O'Connell was interrogated at Children's Hospital, during which she was not in custody. ECF No. 40 at 3–4. Alejo conducted the interview alone and did not record it. *Id*. The interview was conducted in a meeting room, and though the door was unlocked, Alejo stood between the door and Ms. O'Connell. ECF No. 52 at 3. During the interview Ms. O'Connell was sleep deprived and extremely concerned about her son, whom health providers had told her might not survive. *Id*. at 5–6. Ms. O'Connell was not given Miranda warnings. *Id*. at 3. Alejo challenged Ms. O'Connell's denial that she had harmed

12

Kyran and accused her of lying. *Id*. at 6. On a piece of paper, Alejo wrote "accident" and "homicide," and stated "[n]ow, I hate to have somebody go to prison for homicide when it was really an accident." *Id*.

The second interview was conducted by both Alejo and Tuggle, and Gaston was present for some portion of the interview. ECF No. 40 at 4. Alejo continued to challenge Ms. O'Connell's denial that she had harmed Kyran. ECF No. 52 at 3.

Because I may consider either prong of the qualified immunity analysis first, I examine whether the violation was clearly established.

      a. <u>Clearly Established</u>

The events in question occurred in 2003. Therefore, my examination of whether the law was sufficiently clearly established must be confined to pre-2003 precedent, as only those cases published at the time of the incident could alert officers of unlawful conduct. *Ali*, 763 F. App'x at 650. Ms. O'Connell is correct that is has long been clearly established that under the Fifth Amendment confessions must be "made freely, voluntarily, and without compulsion or inducement of any sort." *Haynes v. Washington*, 373 U.S. 503, 513 (1963) (quoting *Wilson v. United States*, 162 U.S. 613, 623 (1896) (internal quotations omitted). She is also correct that courts must evaluate voluntariness by considering the "totality of all the surrounding circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1978). The court must consider whether the officers "took unfair advantage of a defendant's traits or the surrounding circumstances." *United States v. Guerro*, 983 F.2d 1001, 1004 (10th Cir. 1993) (quoting *Colorado v. Connelly*, 479 U.S. 157, 163 (1986)) (internal quotations omitted).

However, these cases define involuntariness at a high level of generality, which under *Mullenix* is not enough to show law was clearly established. *Mullenix*, 136 S. Ct. at 308. To

13

show a clearly established violation, Ms. O'Connell must further show that under the circumstances described, "every reasonable official would have understood that what he is doing violates that right." *Id*.

Ms. O'Connell cites some additional case law that more specifically defines involuntariness, but these cases were either published after the events in this case occurred or are non-binding district court cases. *See* ECF No. 52 at 19 (citing *United States v. Lopez*, 437 F.3d 1059, 1064 (10th Cir. 2006), *United States v. Bundy*, 966 F. Supp. 2d 1180, 1182 (D.N.M. 2013)).

In my own review of the case law, I have not been able to find Supreme Court or Tenth Circuit precedent suggesting that these circumstances amounted to a clearly established Fifth Amendment violation in February of 2003. For example, I find no such case law indicating that an individual's confession garnered during a long, non-custodial interrogation, in which an officer accuses the suspect of lying, while the individual is sleep-deprived and anxious about the health of a child, cannot be voluntary. *See, e.g.*, *United States v. Erving L.*, 147 F.3d 1240, 1249 (10th Cir. 1998) (finding non-custodial confession of juvenile voluntary even though three agents were present and refused to leave after suspect said he did not want to talk); *Elliott v. Williams*, 248 F.3d 1205, 1213 (10th Cir. 2001) (affirming court's determination that custodial statement by defendant who had taken heroin was voluntary and admissible because the suspect's mental condition did not satisfy the requirement for coercive pressure.).

   2. Fourth Amendment

Ms. O'Connell's Fourth Amendment claim is time-barred under *Wallace v. Kato*, 549 U.S. 384 (2007). In *Wallace*, the Supreme Court held that "the statute of limitations upon a § 1983 claim seeking damages for a false arrest in violation of the Fourth Amendment, where the

arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process." 549 U.S. at 397. Ms. O'Connell was detained in February of 2003, and therefore her claim began to accrue on that date. Because Ms. O'Connell did not bring her Fourth Amendment claim within two years of that date,[2] her claim must be dismissed.

Ms. O'Connell argues that hers is a claim for malicious prosecution, and therefore does not accrue until the date her conviction is overturned under *Heck v. Humphrey*, 512 U.S. 477 (1994). ECF No. 52. The claim does state that "defendants caused the initiation and/or continuation of Plaintiff's confinement or prosecution, with malice, resulting in damages." ECF No. 1 at 22. But this statement is conclusory, and the facts that she alleged in the rest of the claim go not towards the manner of her prosecution, but rather towards the allegedly false evidence used to justify her arrest, which was also used at trial. *See id*. at 21–23 (describing Alejo's intentional, knowing, or reckless disregard for the truth in submitting an affidavit containing false statements in order to obtain an arrest warrant). The rest of her complaint deals little with the prosecution of her claim, other than allegations that Alejo and Tuggle fabricated evidence that was used during her trial. Indeed, in her motion Ms. O'Connell agrees that her state law malicious prosecution claim should be dismissed. ECF No. 52 at 20. Because the Fourth Amendment claim challenging the probable cause underlying her arrest is time-barred, I need not address the merits.

3. Fourteenth Amendment

Ms. O'Connell alleges that Alejo fabricated her confession by telling her what to write, and subsequently used that fabricated confession to write his affidavit in support of Ms.

---

[2] "The statute of limitations in a § 1983 suit is that provided by the State for personal-injury torts." *Wallace v. Kato*, 549 U.S. 384, 384 (2007). In Colorado, C.R.S. § 13-80-102 provides a two-year statute of limitations.

15

O'Connell's arrest warrant. Ms. O'Connell's allegedly fabricated confession was used against her at trial. She claims that Alejo similarly fabricated inculpatory statements from Ramirez. She further alleges that Tuggle knowingly fabricated elements of her notes and report including statements made by Ms. O'Connell. I address first whether Ms. O'Connell's allegations amount to a constitutional violation, and second whether such a violation was clearly established.

    a. Constitutional Violation

Individuals have a "Fourteenth Amendment right not to be deprived of liberty without due process of law, or more specifically, as the result of the fabrication of evidence by a government officer acting in an investigative capacity." *Pierce v. Gilchrist*, 359 F.3d 1279, 1285 (10th Cir. 2004).

Defendants do not contest that Ms. O'Connell's fabrication allegations against Alejo, if true, would raise a Fourteenth Amendment issue. They do, however, raise the issue of Tuggle's personal participation in the alleged constitutional violation as required by a § 1983 action. ECF No. 40 at 11–12. Ms. O'Connell alleges that Tuggle fabricated evidence in her report, which provided support for her arrest and prosecution. ECF No. 52 at 8–9. According to defendants, because plaintiff's case is based on criminal charges brought against her, and because social workers do not initiate such things, Tuggle could not have participated in the alleged violation sufficiently to state a § 1983 action against her.

Defendants cite *Franz v. Lytle* as evidence that social workers cannot participate in evidence fabrication for the purposes of § 1983 claims. 997 F.2d 784, 790 (10th Cir. 1993). In *Franz*, a police officer argued that his warrantless search should be treated the same as a social worker's warrantless administrative search because he conducted it for the purpose of investigating suspected child abuse. *Id.* at 784–85. The Tenth Circuit found that the officer's

16

focus "was not so much on the child as it was . . . the potential criminal culpability of her parents," and that "[t]hat focus is the hallmark of a criminal investigation." *Id*. at 791. *Franz* does not address the context here, where the social worker participated in investigatory interviews which solicited a confession from the plaintiff. Nor does it address a situation where a social worker allegedly fabricated reports from those interviews, which included inculpatory statements made by the plaintiff, that were subsequently used to arrest and prosecute her.

More closely related is *Pierce v. Gilchrist*, in which the Tenth Circuit held that a police forensic analyst who "prevaricate[d] and distort[ed] evidence" could be held liable for fabrication of evidence under § 1983. 359 F.3d at 1293. The Tenth Circuit explained that the defendant "cannot 'hide behind' the fact that she neither initiated nor filed the charges," because her actions still helped "cause the deprivations of constitutional rights." *Id*. at 1292–93. Defendants have given me no reason to think that defendant Tuggle should not meet the requirements for a § 1983 fabrication of evidence claim, given that they do not dispute that she participated in an investigation into Ms. O'Connell, and that her participation contributed to Ms. O'Connell's deprivation of liberty.

      b.  Clearly Established

As discussed above, my examination of whether the law was sufficiently clearly established must be confined to pre-2003 precedent. It was clearly established under pre-2003 precedent that an officer's fabrication of evidence in order to bring about a suspect's arrest, prosecution, or conviction violates the Fourteenth Amendment. *Anthony v. Baker*, 767 F.2d 657, 662 (10th Cir. 1985).

Again, *Pierce* is instructive. 359 F.3d at 1297. Though the decision came out after the events in this case, in it the Tenth Circuit considered what rights were clearly established by

17

1986.  *Id*.  The court found it was clearly established by 1986 that individuals have a Fourteenth Amendment "right not to be deprived of liberty as a result of the fabrication of evidence by a government official."  *Id*.  A clearly established violation of that right occurs "when state officials 'conspire to procure groundless state indictments and charges against a citizen based upon fabricated evidence or false, distorted, perjurious testimony presented to official bodies in order to maliciously bring about a citizen's trial or conviction.'"  *Id*. (quoting *Anthony v. Baker*, 767 F.2d 657, 662 (10th Cir. 1985)).  *Pierce* then gets even more specific: the court determined that *Stewart v. Donges*, 915 F.2d 572, 580 (10th Cir. 1990), and *Franks v. Delaware*, 438 U.S. 154 (1978), "clearly established that knowingly, or with reckless disregard for the truth, including false information in the affidavit supporting the arrest warrant constituted a Fourth Amendment violation."  *Id*. at 1299.

Though *Pierce* analyzed whether the above clearly established law met the broader standard under *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), I find this sufficient to meet the narrower standard under *Mullenix*, 136 S. Ct. at 308.  It was "beyond debate" at the time this case occurred in 2003 that an officer could not include false information in an affidavit supporting an arrest warrant.  *See Ali*, 763 F. App'x at 650; *Pierce*, 359 F.3d at 1299.  Ms. O'Connell alleges that Alejo told her what to write, despite the statement's direct contradiction of her own account of the events.  Alejo then applied for an arrest warrant based on her allegedly falsified statement.  This would constitute knowingly including false information in an affidavit supporting an arrest warrant.  Because this was a clearly established constitutional violation, defendant Alejo is not entitled to qualified immunity.

As for Tuggle, Ms. O'Connell alleges that it was clearly established that a social worker cannot assist or acquiesce in the use of false information.  ECF No. 52 at 15–16.  The only pre-

2003 binding precedent Ms. O'Connell cites in *Snell v. Tunnell*, 920 F.2d 673 (10th Cir. 1990). In *Snell*, government social workers deliberately fabricated false allegations of child pornography possession in order to gain entry to a private home. *Id.* at 700. The Tenth Circuit relied on an earlier case, *Franks v. Delaware*, 438 U.S. 154 (1978), in which the Supreme Court found it was a Fourth Amendment violation for an officer to deliberately falsify information in a warrant affidavit. 438 U.S. at 170. The *Snell* court concluded that the "principles of *Franks* apply to the information used in this case," and concluded "that even in the context of a child abuse investigation, a reasonable public official would have known that using known false information to secure an order to justify entry and search of a private home would violate the fourth amendment's proscription on unreasonable searches and seizures." 920 F.2d at 700. Notably the *Snell* court treated social workers in that case no differently than the police officers at issue in *Franks*.

Based on Between *Snell* and *Franks* (and, frankly, common sense), I find that it was clearly established that a social worker, like any other public official, cannot knowingly create false information in furtherance of an investigation. Because Ms. O'Connell alleges that Tuggle deliberately falsified information in her report, I find this alleged violation to be clearly established, and that Tuggle is not entitled to qualified immunity.

**ORDER**

Defendants' motion for summary judgment, ECF No. 40, is granted in part and denied in part.

1. Summary judgment is granted as to Counts I, II, IV, V, VI, VII, VII, IX, X, XI of plaintiff's complaint. Those counts are dismissed.

2. Summary judgment is denied as to Count III of plaintiff's complaint.

3. Remaining are Ms. O'Connell's fabrication of evidence claims against Alejo and Tuggle.

DATED this 16th day of March, 2020.

BY THE COURT:

*[signature: Brooke Jackson]*

_____
R. Brooke Jackson
United States District Judge