IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 18-cv-01359-RBJ

KRYSTAL O'CONNELL,

Plaintiff,

v.

HARRY ALEJO, former Alamosa County Sheriff's Office Sergeant,
MARCIA TUGGLE, former caseworker of the Alamosa Department of Human Services,
BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF ALAMOSA, COLORADO,
and ROBERT JACKSON, Sheriff of Alamosa County, Colorado,

Defendants.

---

ORDER on MOTIONS IN LIMINE

---

Eleven motions in limine are pending. The Court held an evidentiary hearing on September 17, 2020 at which evidence was presented concerning three motions that raised Rule 702/Daubert issues. The parties have submitted the rest of the motions on their briefs. This order addresses the eleven motions.

## BACKGROUND

On January 31, 2003 Krystal O'Connell left her 17-month old son Kyran in the care of Patrick Ramirez. ECF No. 1 at 5. Several hours later, Ms. O'Connell and Ramirez took Kyran to an emergency room, where he was flown by helicopter to Children's Hospital in Denver. ECF No. 40 at 2. Kyran later died of his injuries.

Defendant Alejo, an Alamosa County Sherriff's Office sergeant, spoke with Ms. O'Connell and Kyran's father, Damien Gaston, at the Alamosa emergency room before they left

1

for Denver, and he interviewed Ramirez at the Sherriff's office.  Ramirez said Kyran fell from his shoulders and hit his head; that his elbow hit Kyran on his side; and that Kyran fell when attempting to walk.  ECF No. 52-6 at 86:3–7.  He said that he shook Kyran and smacked his face and "was too forceful when I tried to get him to wake up."  *Id*. at 113:1–10.  Ramirez wrote and signed a statement.  *Id*.  Ramirez also told Alejo that he put Kyran into the bathtub, where Kyran slipped and hit his head again.  ECF No. 1 at 6.  Alejo told Ramirez that Kyran's injuries were inconsistent with Kyran falling and hitting his head, though he admits now that he had no basis for this claim.  *Id*. at 99:16–100:25.

In another interview Ramirez reiterated the same version of events, while also admitting to smoking marijuana and drinking beer.  ECF No. 52-6 at 3–4, 9–10.  He was arrested for having caused Kyran's injuries.  ECF No. 40 at 3.  Defendant Tuggle from Alamosa County Department of Social Services interviewed Ramirez in jail, and Ramirez told the same story.  *Id*.  Alejo interviewed Gaston and O'Connell but did not record either interview.  ECF No. 52 at 3.  According to her statement, Ms. O'Connell "shook [Kyran] 2–3 times, and probably more violently than I meant to."  ECF No. 42-1.

Ms. O'Connell alleges that she told Alejo that Kyran was fine the night before and morning of the incident.  ECF No. 52 at 6.  She claims Alejo accused her of lying, made her repeat her story, and accused her of causing Kyran's injuries and shaking him.  *Id*.  She alleges that Alejo wrote down the words "homicide" and "accident" on a piece of paper and stated: "Now, I hate to have somebody go to prison for homicide when it was really an accident."  *Id*. She claims that Alejo told her what to write and convinced her that she had contributed to Kyran's injuries, though she told him she never hurt Kyran.  ECF No. 52 at 3.  Alejo did not arrest Ms. O'Connell at the conclusion of the interview.  *Id*.

Tuggle interviewed Ms. O'Connell and Gaston with Alejo present.  ECF No. 40 at 4. According to Tuggle's report, Ms. O'Connell admitted to shaking Kyran "really hard," and that she "slammed him on the bed."  ECF No. 41-2.  Ms. O'Connell alleges that during the interview Alejo asked Gaston to leave and then began to interrogate her and accuse her of lying.  ECF No. 52 at 3.  Ms. O'Connell denied these accusations.  *Id*. at 3–4.

Ramirez recanted his statements, claiming to have been covering for O'Connell, and that Kyran had been hurt when he arrived at the house on January 31st.  ECF No. 40 at 4.  Ramirez denies that he was coerced or manipulated into changing his story.  *Id*.  Ms. O'Connell was arrested on a warrant that had been issued pursuant to an affidavit filed by Alejo.  ECF 52 at 8.

In the criminal proceeding Ms. O'Connell claimed her statements were involuntary and coerced.  Her motion to suppress was denied, and her statement was introduced at trial.  *Id.* at 4. Ms. O'Connell admitted that she wrote the statement, but she claims that Alejo told her what to write.  *Id*.  Ms. O'Connell was convicted of child abuse resulting in death, and her appeal did not raise the issue of voluntariness.  ECF No. 40 at 5–6.

In 2017 Ms. O'Connell's conviction was overturned based on ineffective assistance of counsel because her counsel should have pursued medical evidence that Kyran's injuries were consistent with having fallen from Ramirez's shoulders.  *Id*.  She now seeks damages from defendants for violating her rights.  ECF No. 1.

On March 16, 2020 the Court issued an order granting summary judgment dismissing ten of the plaintiff's claims in the case.  ECF No. 92.  That order left for trial only Count III in which plaintiff claims that Alejo and Tuggle deprived her of due process in violation of the Fourth Amendment by withholding exculpatory evidence and fabricating inculpatory evidence, causing her to be wrongly prosecuted, convicted, and imprisoned for nearly eleven years.  ECF No. 92.

Plaintiff's motion for reconsideration of the Court's dismissal of Count II, ECF No. 98, was granted, thus reinstating her Fourth Amendment claim asserting deprivation of liberty without probable cause, essentially malicious prosecution. ECF No. 126.

A trial is presently set to begin on November 2, 2020. However, on April 15, 2020 defendant Tuggle filed an interlocutory appeal in which she asserts that the Court erred in failing to sustain her invocation of the qualified immunity doctrine and, thereby, failing to dismiss the claims against her. *See* ECF No. 111. That appeal is pending, and unless the appellate court addresses the appeal before the current trial date, the trial is likely to be continued.

## STANDARD OF REVIEW

In several of the motions plaintiff argues that expert witnesses were not properly disclosed by the defendant, and their opinions should be limited or stricken. Disclosure of expert testimony is governed by Rule 26(a)(2) of the Federal Rules of Civil Procedure. A witness who is retained to provide expert testimony in the case must prepare a written report that contains (1) a complete statement of the expert's opinions and the bases for them; (2) the facts or data considered by the expert; (3) any supporting exhibits; (4) the experts qualifications including any publications authored within the previous 10 years; (5) a list of cases in which the expert has testified within the previous 4 years; and (6) the compensation paid to the expert. Fed. R. Civ. P. 26(a)(2)(B). An expert who was not specially retained to testify, for example a physician who treated the patient, is not required to write a report. However, the facts and opinions of the non-retained expert must be disclosed. Fed. R. Civ. P. 26(a)(2)(C).

Plaintiff also challenges the admissibility of several experts' opinions under Rule 702 of the Federal Rules of Evidence. Under that rule, a qualified expert may provide opinion testimony if his or her specialized knowledge would assist the factfinder, and the opinions are based on

sufficient facts and reliable methods properly applied to the facts. Put another way, the evidence must be both relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Expert opinions are relevant if they would "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 591. They are reliable if, in addition to the expert being qualified, his opinions are "scientifically valid" and based on "reasoning or methodology [that] properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593.

The proponent of expert testimony has the burden to show that the testimony is admissible. *United States v. Nacchio,* 555 F.3d 1234, 1241 (10th Cir. 2009). The trial court plays a "gatekeeping" role that involves an assessment of the "reasoning and methodology underlying the expert's opinion" and a determination of "whether it is scientifically valid and applicable to a particular set of facts." *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000). However, the trial court has discretion as to how to perform this gatekeeping function. *Id.*

### DISCUSSION

1. **ECF No. 59: Plaintiff's Motion in Limine to Bar Opinion Testimony of Dr. Michael Taravella.**

Dr. Taravella, an ophthalmologist, was on call at Children's Hospital in Denver when Kyran was brought there by air ambulance from Alamosa. He examined Kyran and documented his findings and conclusions in the medical records. Notably, Dr. Taravella testified as an expert in the 2016 hearing on Ms. O'Connell's motion to set aside her conviction. He believes that he testified in her preliminary hearing in 2003, but he did not testify during her trial in 2004.

a. <u>Disclosure Issue</u>.

Defendants have disclosed Dr. Taravella as a non-retained treating physician expert.

Plaintiff argues that he will be offering opinions outside the course of treatment and must provide

a written report.  Plaintiff objects specifically to two opinions that Dr. Taravella might offer: (1)

his conclusion in a 2003 medical record that Kyran's retinal hemorrhages were "consistent with

non-accidental trauma," which were not developed for the purpose of treatment but as a result of

the investigation to determine the cause of the injury; and (2) Dr. Taravella's deposition testimony

that brain swelling could not have caused the retinal hemorrhages.  ECF No. 59 at 7–11.

Plaintiff's application of Rule 26 as to Dr. Taravella, as with the other two experts who

testified at the September 17, 2020 hearing in this case, is misplaced.  Dr. Taravella is not a

retained expert.  Defense counsel did not retain him, nor did he even meet Dr. Taravella before

endorsing him.  Nor is this the more usual treating physician situation where the parties dispute

whether the opinions disclosed by counsel extend beyond the opinions the physician formed for

the purpose of his treatment of the patient.  Dr. Taravella's opinions are based on his treatment of

Kyran, and they have been expressed not just in the original medical records but in the testimony

he gave in the criminal case, well before the present civil case was filed.  That information was all

available to both sides of the present case, and indeed, the transcript from the criminal case

hearing has apparently been provided by the plaintiff team to the defense in this case.  In his

testimony at the September 17, 2020 hearing Dr. Taravella testified that the opinions he discussed

at that hearing are, with one exception, the same opinions that he has expressed in the criminal

case.  The purposes served by Rule 26, namely, full and fair disclosure of the expert's opinions,

has been accomplished, even more so than in a typical Rule 26 disclosure, since those opinions

were provided in testimony under oath and subject to cross-examination by counsel for Ms. O'Connell well before she filed the present civil case.

The one exception is that during his deposition in the present case, noticed by plaintiff's counsel, Dr. Taravella expressed the opinion that intracranial pressure does not cause retinal hemorrhages such as those he saw in Kyran's eyes. However, he explained that it was an issue that came up during the 2016 hearing in the criminal case as to which he was not sure of the answer at that time. Upon learning that he was to be deposed in the present case, Dr. Taravella on his own initiative did additional research in the medical literature and formed the opinion that he provided in response to questions posed during his deposition. Ordinarily I do not permit experts to expand on their written reports in response to deposition questions. In this instance, however, this was not an expansion known or encouraged by defense counsel. Rather, it was an opinion that the physician formed on his own to clarify his own thinking on an issue that arose in the criminal case, and it was revealed to both parties at the same time.

Because this one opinion was not disclosed in prior records or testimony, though at no fault of the doctor or the defense, I will direct defense counsel not to solicit the opinion on direct examination, but with the following proviso. If plaintiff's counsel opens the door to this issue in her opening statement or otherwise before Dr. Taravella testifies; or if plaintiff's counsel intends to raise the issue through another witness after Dr. Taravella testifies; or if plaintiff's counsel opens the door to it on cross-examination, then Dr. Taravella may express the opinion. Put another way, if the issue of whether intracranial pressure can cause retinal hemorrhages is going to be an issue raised by the plaintiff in this case, then defense counsel may inquire of Dr. Taravella's opinion about it.

b. <u>Rule 702 Issue</u>.

Plaintiff argues that Dr. Taravella's opinion does not help the jury decide whether it is more likely the retinal hemorrhages were caused by head and brain injury due to falling or due to shaking. I disagree. Dr. Taravella examined Kyran at Children's Hospital. Both in prior testimony and again during this case he has explained his findings in detail. His opinion is that Kyran's retinal injuries are consistent with non-accidental abusive head trauma and not consistent with an accidental fall off the shoulders of an adult carrying him. Plaintiff's position in this civil case is that she was factually innocent. She claims that defendants fabricated evidence that resulted in her conviction by extracting an involuntary confession from her (that she shook Kyran and slammed him against a bed) and by manipulating Ramirez into recanting his admission of responsibility (that Kyran fell off his shoulders, that he then fell on Kyran, that he accidently hit Kyran's head on hard objects) and instead making false, inculpatory statements against Ms. O'Connell. *See, e.g.,* ECF No. 1 at 2, ¶¶2-4; at 9, ¶60;l at 10, ¶64-66; at 11-13, ¶¶69-88; at 14 ¶¶91-94. Although Dr. Taravella does not purport to know who administered the injuries to Kyran, his opinions concerning the type of trauma that is more likely to have caused the injuries he saw are relevant and rather obviously would be helpful to a lay juror who would have no ability to understand the significance of retinal hemorrhages.

To complete the Rule 702 analysis, I find that Dr. Taravella is qualified to express such opinions. He has been a board-certified ophthalmologist since 1987. He is a Fellow of the American Academy of Ophthalmology. Approximately 97% of his practice is treatment of patients, notably, children. He estimates that he has conducted something like 25,000 retinal examinations. He testified at the September 17, 2020 hearing in this case that his opinion that

bilateral retinal hemorrhages and the pattern he observed are consistent with abusive head trauma reflects the consensus of ophthalmologists and is supported by the medical literature.  He has cited relevant studies that are documented in the medical literature and has provided copies of relevant articles to counsel for both sides.

I conclude that Dr. Taravella's opinions are relevant and reliable.  With the limited exception I have discussed concerning the opinion that he developed on his own between his 2016 testimony and his deposition in this case, plaintiff's motion in limine is denied.

2. **ECF No. 60: Plaintiff's Motion in Limine to Bar Opinion Testimony of Dr. Laura Fenton.**

Dr. Fenton is board-certified in pediatric radiology and diagnostic radiology.  She is a Fellow of the American College of Radiologists.  She has worked as a pediatric radiologist at Children's Hospital in Denver for 21 years and is a member of its Child Protection Team.  She was the on-call pediatric radiologist in Kyran's case and, as such, she reviewed and interpreted his imaging as part of the treatment team in January and February, 2003.  She testified at the criminal hearing in Ms. O'Connell's case in 2016 and expressed the same opinions that she had formed in 2003.  She also has expressed her opinions again in a deposition noticed by plaintiff counsel in the present case and during the September 17, 2020 hearing on plaintiff's motions in limine.

Dr. Fenton's opinions are based on her examination of Kyran's radiologic imaging and the history she was provided in 2003.  Briefly summarized, she believes that Kyran's head injuries are indicative of abusive head trauma, namely, a diffuse brain injury resulting from rapid acceleration and deceleration of the brain such as by non-accidental shaking or shaking with trauma.  Relatedly, she believes the injuries are not consistent with a sudden impact fall such as a fall from an individual's shoulders.  She testified (and no contrary evidence has been provided)

that these opinions are supported by extensive studies in the medical literature, even though obviously that cannot be based on shaking or knocking the heads of real babies, and that they are generally accepted in the medical community. She also believes there is an indication of a prior, healed tibia fracture.

Plaintiff's objections to Dr. Fenton's testimony are similar to those asserted about Dr. Taravella's testimony – she did not provide a written report, and her opinions do not meet the tests of Rule 702 and *Daubert*. I disagree for similar reasons to those expressed with respect to Dr. Taravella. Dr. Fenton is not a retained expert. Her opinions were fully disclosed in documents relating to her examination of the patient and in her testimony in the criminal case. Her opinions remain the same today, and that has been confirmed by plaintiff's deposition of her and by her testimony at the September 17, 2020. There is no basis under Fed. R. Civ. P. 26 to exclude her opinions on disclosure grounds, so long as her testimony is limited to the opinions she documented in 2003 and the opinions she expressed in the 2016 criminal hearing. Her opinions are relevant and will be helpful to a lay juror who has no basis to interpret radiologic images such as X-rays, CT scans, or MRI's. Her opinions are sufficiently reliable based on her training and experience and her unrefuted testimony that they are generally accepted in her field and supported by research documented in medical literature.

One issue that arose concerned Dr. Fenton's alleged refusal to answer questions about her opinions in her deposition in this case. By way of background, defense counsel had not even met or spoken with Dr. Fenton before the deposition, which was noticed by plaintiff's counsel. According to Dr. Fenton, plaintiff's counsel instructed her to express only "facts" and not "opinions" about the case, and counsel indicated that plaintiff therefore would not compensate her for her time. That was confusing to Dr. Fenton, and she testified in the September 17, 2020

hearing that she did not know how she was expected to respond.  In fact, what a radiologist does is look at images and express opinions as to what they show.  Moreover, Dr. Fenton had expressed opinions in the 2016 hearing about what the images indicated about the likely cause of Kyran's brain injuries.  I attribute her declining to answer certain questions during her deposition to misunderstandings and miscommunications between her and plaintiff's counsel, not to any misconduct by anyone.  It doesn't affect my ruling, because Dr. Fenton's opinions had been disclosed in the criminal case and were known to the plaintiff team well before the deposition was held in this case.

Finally, plaintiff's object to Dr. Fenton's describing Dr. Barnes as a child abuse "denialist," as she did at the 2016 hearing.  According to plaintiff, denialists "deny the existence of child abuse or otherwise defend child abusers."  ECF No. 61 at 1.  Plaintiff argues that any reference to "denialists" is inappropriate and unduly prejudicial.  *Id.*  Defendants do not oppose this part of plaintiff's motion and, I presume, they do not intend to elicit that opinion from Dr. Fenton.  Accordingly, I grant plaintiff's motion to the limited extent that I direct counsel to inform Dr. Fenton to avoid the term "denialist," unless, of course, plaintiff in some manner opens the door to it.  However, that does not prevent Dr. Fenton from expressing any disagreement with Dr. Barnes' opinions that has previously been disclosed, including her apparent view that some of the medical experts who assert that there have been dramatic changes in the understanding of abusive head trauma "seem to have a large portion of their livelihood dependent on expert witness fees."  ECF No. 86 at 1.

### 3.  <u>ECF No. 61: Plaintiff's Motion to To Bar Any Reference to Challenges to SBS/AHT as "Denialism."</u>

Plaintiff intends to introduce experts who contradict defendants' experts on SBS/AHT medical evidence.  Plaintiff moves to bar defendants from saying that doctors who challenge SBS/AHT are "denialists," or that they engage in the practice of "denialism."  As mentioned above, Dr. Fenton referred to Dr. Barnes, a plaintiff expert, as a denialist because he contradicts SBS/AHT theories and disagrees with how such theories have been applied to this case.  Plaintiff argues that any reference to "denialists" or "denialism" is inappropriate and prejudicial.  ECF No. 61 at 2.

Defendants do not oppose this motion.  However, defendants argue that many of these doctors "seem to have a large portion of their livelihood dependent on expert witness fees."  ECF No. 86 at 1.  This motion is GRANTED, with the caveat that testimony relating to expert fees and payments is admissible as it is relevant and will assist the jury in assessing witness credibility.

## 4. ECF No. 63: Defendants' Motion to Exclude False Confession Testimony of Psychologist Deborah Davis, Ph.D.

Now the shoe is on the other foot, as it is the defendants who are raising Rule 702/Daubert issues about plaintiff's expert.  Neither party requested a hearing on this motion.  In support of their argument, defendants cite to numerous cases, but they rely most heavily on *U.S. v. Benally*, 541 F.3d 990 (10th Cir. 2008), which held that the trial court did not abuse its discretion in excluding not only an expert on false confessions, but this precise expert, Dr. Davis.

Plaintiff argues that Dr. Davis's opinions are based on sound methodology.  She concedes that the *Benally* court excluded Dr. Davis's testimony in a previous case. However, she argues that *Benally* did not hold that all such testimony was inadmissible, but rather that the trial court did not abuse its discretion by excluding such testimony in that specific case.  ECF No. 87 at 2. Furthermore, plaintiff provides evidence that acceptance of the science underlying false

confessions has become more widespread in the scientific community sine the 2008 *Benally* ruling. ECF No. 87 at 6.

Because defendants do not argue that plaintiff is unqualified, the thrust of this analysis lies with whether Dr. Davis's testimony is reliable. In assessing how she reaches her conclusions, she provides ample research on how interrogations are conducted. Plaintiff cites authority indicating that courts have concluded "that the science of psychology in relation to police coercion in interrogations is sufficiently developed to constitute a reliable body of specialized knowledge." *See* ECF No. 87 at 3. Additionally, she provides evidence from *The American Psychologist*, a peer-reviewed scholarly journal of the American Psychological Association, indicating a broad consensus in the scientific community that false confessions occur, and that approximately 80% of the scientific community agrees. ECF No. 87 at 6.

Defendants argue that Dr. Davis may not testify about the credibility of any witness in this case. Plaintiff does not disagree and represents that "[Dr. Davis] will not testify about whether plaintiff's confession was true or false or whether it was in fact coerced." ECF No. 87 at 7. I agree that Dr. Davis cannot comment about the credibility of any witness in this case. A limiting instruction may be appropriate to assure that jurors understand that assessing the credibility of the witnesses in the case is a function of the jury on which an expert witness may not comment. However, I conclude that the science has advanced to the point that her general opinions about false confessions is admissible. Defendants' arguments largely go to the weight the jury should afford Dr. Davis's testimony rather than its admissibility.

5. **ECF No. 66: Plaintiff's Motion in Limine to Bar Opinion Testimony of Dr. Elizabeth Kinney.**

Dr. Kinney was not called as a witness during the September 17, 2020 hearing, and the parties ask the Court to rule on the motions and briefs without a hearing.  She is an emergency room doctor who treated Kyran at the San Luis Valley Regional Medical Center on January 31, 2003.  Like defendants other medical experts, she is not a retained expert.  Without repeating what I have previously written about Drs. Taravella and Fenton, so long as Dr. Kinney's testimony is limited to what was in her medical record and to opinions, if any, that she has expressed in testimony in the criminal case, I conclude that there is no Rule 26 disclosure problem.

Defendants argue that Dr. Kinney's opinions are particularly relevant to the issue to be tried in the present case because defendants relied on those opinions in making decisions and acting on those decisions action in 2003.  Plaintiff's argument to the contrary is undermined by the fact that Sgt. Alejo was quickly called to the hospital in Alamosa due to the severity of Kyran's injuries, and it is a reasonable inference that Dr. Kinney, as the treating physician, played some role in his being called.  ECF No. 89 at 2.  However, this is fair game for cross-examination.

As for Rule 702, plaintiff points out that Dr. Kinney has admitted to not being an expert in "brain swelling, edema, or shaken baby syndrome."  ECF No. 66-3 at 13.  What Dr. Kinney meant by that statement in her deposition is unclear, because immediately following the statement Dr. Kinney testified that her understanding is that diffuse brain swelling could be caused by multiple contusions, blows to the head, or shaking a baby where there might not be any external evidence of damages to the skull or scalp.  *Id.*  Interestingly, she notes that Mr. Ramirez reported that he shook Kyran, and she expresses the opinion that that could have been the etiology of the brain injury she saw.  *Id.* at 13-14.  I note that even if one accepts the proposition that Kyran's brain injuries were caused by shaking or shaking and slamming him, it could have been either Ms.

O'Connell or Mr. Ramirez or even both of them that did the shaking and slamming.  In that sense plaintiff's opposition to Dr. Kinney's testimony is somewhat puzzling.

There does not appear to be a dispute over Dr. Kinney's credentials and qualifications as an emergency room physician.  ER doctors, of necessity, must have knowledge about a wide variety of injuries that present in the emergency room under emergent conditions.  However, she does not claim to have the specialized knowledge of, for example, Drs. Taravella, Fenton or Wells (below).  Her testimony will be limited to what she documented in her medical records as Kyran's initial treating physician and any testimony she might have given in the criminal case.  The limits of her expertise in the area of what formerly was called shaken baby syndrome can be tested on cross-examination.  It is not my impression that the defendants plan to rely on Dr. Kinney for that purpose.  This motion in limine is granted to the extent that Dr. Kinney cannot express opinions about the existence or causes of shaken baby syndrome or the specific cause of Kyran's edema (brain swelling) in this case.  However, that is a two-way street, and plaintiff may not elicit such opinions either.

6.  **ECF No. 67: Plaintiff's Motion in Limine to Bar Testimony of Carol Wahlgren.**

Defendants have endorsed Ms. Wahlgren, a social worker, as an expert so that she can opine on whether Ms. Tuggle "held any malice toward [Plaintiff] in 2003," "colluded in any way with the Alamosa County Sheriff's Department… or anyone else, to create false statements," "coerce[d] a false confession, or fabricate[d] evidence."  ECF No. 67-1 at 1.  Plaintiff argues that such testimony improperly invades the province of the jury by making credibility determinations. ECF No. 67 at 1.

Defendants respond that Ms. Wahlgren will not opine on credibility but instead on "whether Ms. Tuggle was conducting her investigation in conformance with pertinent statutes and

regulations *in good faith."* ECF No. 79 at 11 (emphasis added).  Furthermore, they argue she is a proper rebuttal witness to Dr. Deborah Davis, plaintiff's false confessions expert.

Plaintiff raises valid concerns about Ms. Wahlgren's testimony potentially invading the province of the jury.  Defendants' argument that she will opine about whether Ms. Tuggle acted in "good faith" or whether she "coerced a confession" or "fabricated evidence" goes directly to witness credibility and should be for the jury to decide.  However, if defendant can lay a proper foundation as to her knowledge and expertise, her testimony as to what the standard of care was for social workers in making investigations of potential child abuse cases would be relevant and helpful to the jury.

Plaintiff argues, however, that such opinions should be excluded under Fed. Evid. Rule 403.  Specifically, plaintiff takes issue with the following testimony: Ms. Tuggle's job as a caseworker "was to decide if it was 'more likely than not' that [Ms. O'Connell] contributed to Kyran's injuries. . . . Her job was not to decide beyond a reasonable doubt regarding [Ms. O'Connell's] complicity in the injuries…"  ECF No. 67 at 4.  Plaintiff argues that admitting such testimony at trial would be "wholly confusing the issues and misleading to the jury." *Id.*  I do not understand how that would either confuse or mislead the jury on the issue remaining for trial: did Ms. Tuttle participate in the fabrication of evidence by putting pressure on either Ms. O'Connell or Mr. Ramirez to provide false testimony.  Her job was not to fabricate evidence.  There is a stark and obvious difference between a requirement to decide what a social working thinks probably happened and procuring false testimony.

I agree with plaintiff that it will not be helpful to the jury for Ms. Wahlgren to "regurgitate" statutes and regulations.  I do not see how that would be necessary in providing the jury with an understanding of what the duties of a social worker were under the rules and

16

regulations that govern them as at 2003 in terms of investigating and reporting on incidents of possible child abuse.  I also note that defendant intends to call Ms. Wahlgren as a rebuttal witness if Dr. Davis testifies that it is coercive and inappropriate to have interviewed plaintiff at the hospital where her son was being treated, again assuming that she has a proper foundation of knowledge and expertise to testify about the standard of care applicable to such interviews in 2003.

Plaintiff also asserts that Ms. Wahlgren relied on inadmissible hearsay in forming her opinion.  It is not clear how that would be if her testimony is limited to the standard of care applicable to social workers at that time.  Nevertheless, per Rule 703, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data… they need not be admissible for the opinion to be admitted."  Fed. R. Evid. 703; *TK-7 Corp v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993).  Provided proper foundation is laid, Ms. Wahlgren should be permitted to rely on such statements to reach a conclusion.

I conclude that, assuming that defendants lay a proper foundation for Ms. Wahlgren's knowledge and expertise, she may testify consistently with her expert report to the extent her testimony is limited to the standard of care applicable to social workers as at 2003, including Ms. Tuggle, in terms of their duties and obligations upon learning of an incident that is suspicious for possible child abuse.

7.   **ECF No. 68: Defendant's Motion in Limine to Exclude Evidence of Factual Innocence.**

Defendants argue that plaintiff's factual innocence is irrelevant to prosecution of her § 1983 claim.  Furthermore, they argue that permitting testimony relating to such evidence is unfairly prejudicial as it will "impermissibly result in a reprise of her criminal prosecution 17

years" later.  ECF No. 68 at 2.  Accordingly, they seek to exclude several of plaintiff's retained and non-retained expert witnesses, including Janice Ophaven, M.D., Mark Borchert, M.D., Joseph Scheller, M.D., and Kenneth Monson, Ph.D., and Robert Bux, M.D. (non-retained; coroner).  According to defendants, the sole purpose of such testimony is to present evidence suggestive of innocence, which was unavailable to defendants when the investigation was being conducted.  ECF No. 68 at 2.  As a result, defendants argue that such evidence is irrelevant under 401 and 402, and unfairly prejudicial under 403.  ECF No. 68 at 13.  In their reply, defendants shift the focus of their argument and claim that such evidence will impermissibly bolster plaintiff's credibility.  ECF No. 99.

Plaintiff argues that evidence of factual innocence is necessarily relevant in a wrongful conviction and malicious prosecution case.  Specifically, she argues that it goes to liability and damages.  ECF No. 77 at 2.  Furthermore, she argues that defendants intend to introduce evidence of guilt, and therefore not allowing plaintiff to introduce evidence of innocence would be unfairly prejudicial.  *Id.*

The central issue in this case is whether defendants violated plaintiff's rights by falsifying evidence to wrongfully convict her.  In my view, under the Rule 401 standard, expert testimony suggesting that Kyran's death could have occurred in a manner provided by Mr. Ramirez's initial confession has some tendency to makes it more probable that defendants falsified evidence than it would be without the evidence.  If there was no possible way for Mr. Ramirez's version of events to be true, then plaintiff would have no claim.  Moreover, defendants' expert testimony suggests that Mr. Ramirez's initial version of the facts would not explain Kyran's injuries, thus having some tendency to suggest that his recantation and his testimony implicating Ms. O'Connell was true.  Ms. O'Connell is entitled to offer contrary expert testimony.

The evidence is, of course, potentially prejudicial to the defendant, but that does not mean that it is unfairly prejudicial.  I conclude that its potential relevance is not *substantially* outweighed by its prejudicial effect.  However, I note that plaintiff has tendered a significant number of experts to provide alternative opinions, and at some point, the evidence might be excludable under Rule 403 as unnecessarily cumulative.  That can only be determined in the context of what is presented at trial, but plaintiff would be well advised to consider and avoid that issue in her decisions on which experts to call.

Finally, the fact that defendants might not have had the benefit of those expert opinions evidence at the time is not a good reason to exclude the evidence.  That fact can easily be pointed out by the defendants at trial if they wish to do so, and it would likely be obvious anyway.  I admit to a degree of curiosity as to why defendants would emphasize this point, as it seems inconsistent with the inferences defendants seem to be urging on the jurors through the testimony of experts Taravella, Fenton and Wells.  In any event, defendants did know that Mr. Ramirez initially confessed to dropping Kyran on his head, falling on him, shaking him, and putting him in a bathtub, where he fell and hit his head multiple times.  While defendants are correct that a § 1983 action is not meant to relitigate an entire criminal case, the jury should be permitted to hear this evidence in order to contextualize the plausibility of Mr. Ramirez's initial confession, which in turn has at least some tendency to make it more plausible that he could have been pressured to change from a true story to a false one.

### 8.  **ECF No. 69: Plaintiff's Motion in Limine to Bar Testimony of Martin Vigil**

Mr. Vigil, now retired, was for 27 years a detective with the Denver Police Department. His expert report, ECF No. 69-1, discusses police interview and interrogation techniques that he acquired through his training and experience as a police officer.  He then discusses Sgt. Alejo's

interviews of Mr. Ramirez and Ms. O'Connell, as well as the written statements that they executed, and expresses opinions as to whether Sgt. Alejo's conduct in interrogating the witnesses and obtaining statements was within the standard of care applicable to police officers. He also expresses opinions rebutting opinions expressed by plaintiff's expert Dr. Davis. Plaintiff did not request a hearing on her motion and asked the Court to decide the motion in limine on the briefs.

As with other defense experts plaintiff argues broadly that the expert opinions rendered by Martin Vigil should be inadmissible under Rules 402, 403, 702, and *Daubert*. Specifically, she claims that Mr. Vigil's testimony will not assist the jury in resolving any factual issues, and that his testimony is merely an attempt to bolster Sgt. Alejo's credibility. ECF No. 69 at 2. Additionally, she argues that Alejo's testimony is irrelevant, misleading, and "not based on any identifiable or reliable methodology." ECF No. 69 at 3. "The question of whether Plaintiff or Alejo is telling the truth about what was said in that interrogation is for the jury to determine." *Id.* at 2.

Defendants respond that Mr. Vigil's testimony will not usurp the role of the jury, and that the "jury is intelligent enough to ignore what is unhelpful in its deliberations." ECF No. 80 at 7 (quoting *U.S. v. Gutierrez de Lopez,* 761 F.2d 1123, 1136 (10th Cir. 2014)). Furthermore, defendants argue that Mr. Vigil is qualified, and his methods are reliable.

I agree with defendants that Detective Vigil is qualified based on his years of experience as an investigator and the sheer number of homicide cases he has investigated. However, I agree with plaintiff that many of Vigil's conclusions in the report go directly to witness credibility and thereby impermissibly invade the province of the jury. *See United States v. Toledo*, 985 F/2d 1462, 1470 (10th Cir. 1999) ("…credibility of witnesses is generally not an appropriate subject

for expert testimony.").  For instance, the following conclusions are pulled directly from his report:

- o  "[Ramirez's] written statement was voluntary; no coercion or promises were given by Sgt. Alejo." ECF No. 69-1 at 6.

- o  "If you look at the statement written by Ms. Voss, it doesn't appear that Ms. Voss was depleted through non-sleep. . .." *Id.* at 9.

- o  No coercion was present because "Sgt. Alejo testified under direct testimony that he did not coerce, intimidate, or solicit a confession from Ms. Voss." *Id.* at 10.

Those conclusions invade the province of the jury and are not based on any methodology aside from reviewing Alejo's testimony and taking it as true.  In fact, in dictating what the methodology is, defendants merely regurgitate Vigil's years of experience.  As with plaintiff's expert Dr. Davis, this expert's knowledge of investigative and interrogation tactics would be useful to the jury, and he can identify any such tactics that Sgt. Alejo used and whether Sgt. Alejo's tactics comported with accepted investigative methods at the time.  However, he cannot express opinions as to whether Ms. O'Connell's or Mr. Ramirez's statements were fabricated or coerced, and specifically whether Sgt. Alejo's denial of such fabrication or coercion is credible, nor can he speculate about Ms. O'Connell's mental state when her "confession" was made.

As with Dr. Davis, Mr. Vigil can express opinions, assuming the proper foundation is laid and to the extent expressed in his report, concerning whether the Reid Technique was a standard and required investigation and interrogation technique in 2003, and whether the standard of care at the time required Sgt. Alejo to use that technique.  He can express opinions, again so long as the proper foundation is laid and the opinions are disclosed in his report, as to whether the

standard of care at the time required that witness interviews be recorded and the extent to which it was appropriate for an officer to participate in the wording of a witness's written statements.

9. **ECF No. 70: Plaintiff's Motion in Limine to Bar References to Financial Inability to Pay and Appeal to Jurors as Taxpayers.**

Plaintiff argue that defendants' financial status, i.e., any alleged inability to pay a compensatory damages award, and whether they are indemnified by their employers or by insurance coverage for such damages, is irrelevant and should not be allowed. I agree.

However, to the extent plaintiff seeks punitive damages, the otherwise bright line is not so bright. Generally speaking, punitive damages are intended to punish a wrongdoer and to set an example for others. The size of an award that is necessary and appropriate to punish a typical individual defendant would ordinarily be different than what it would take to punish, for example, a typical large corporation or governmental entity  Thus, these defendants' alleged ability or inability to pay punitive damages is relevant. I agree. *See, e.g., Perrin v. Anderson*, 784 F.2d 1040, 1047-48 (10th Cir. 1986) (because punitive damages were requested, "[t]he ultimate source of payment therefore is relevant . . .. The jury must know the impact an award will have on the defendants to properly assess punitive damages."). Plaintiff does not dispute that proposition.

However, plaintiff argues, if defendants present evidence of their financial inability to pay punitive damages, then plaintiff should be permitted to counter with evidence (if they have such evidence) that an award of punitive damages against them will be indemnified and paid by others. I agree with this as well, and there is support in the case law. *See, e.g.*, *Lawson v. Trowbridge*, 153 F.3d 368, 379 (7th Cir. 1998); *Hill v. City of Chicago*, No. 06 C 6772, 2011 WL 3205304, at *4 (N.D. Ill. July 28, 2011); *Gonzalez v. Olson*, No. 11 C 8356, 2015 WL 3671641, at *7 (N.D. Ill. June 12, 2015).

This is where the parties and counsel need to exercise judgment.  Is it worth it for plaintiff to seek punitive damages on top of what could be a substantial compensatory award if plaintiff proves that defendants coerced or induced false testimony that resulted in her conviction?  Is it worth it for defendants to introduce evidence of inability to pay if that opens the door to evidence of indemnification?  I leave it to them to answer these questions.

Finally, plaintiff argues that defendants should not, in any event, appeal to the jurors' pecuniary interests as taxpayers.  Again, I agree.  In my view this argument grossly underestimates the ability and commitment of jurors to decide the case based on the facts and the law, not on some unlikely notion that they (who don't even live in the involved community) might in some way have their tax bills increased if they award punitive damages.  But, to the defendants I say, if you are tempted to make such a suggestion to the jury, don't.

**10. ECF No. 71: Plaintiff's Motion in Limine to Bar Character Evidence and Prior Bad Acts.**

Plaintiff asks the Court to exclude any mention of several "bad acts" attributed to both plaintiff and other potential witnesses pursuant to Fed. R. Evid. 401, 403 and 404.  Defendants dispute most of plaintiff's requested exclusions.  I address them in turn.

a. The criminal conviction of P's current husband, Brian O'Connell.

Mr. O'Connell apparently pled guilty in 2005 to one count of illegal practice of medicine, one count of perjury, one count of theft, one count of criminally negligent homicide, and one count of third-degree assault.  ECF No. 82-1.  He was sentenced to 13 years in the Colorado Department of Corrections.  Currently, Mr. O'Connell is not on either party's witness list.  The short answer is that if Mr. O'Connell testifies, his credibility will be subject to impeachment to

the extent, and only to the extent, permitted by Fed. R. Evid. 609.  Since it does not appear at this time that he will be a witness, I will leave it at that for now.

b. <u>Marijuana consumption</u>.

Evidence that either Ms. O'Connell or Mr. Ramirez were smoking or otherwise consuming marijuana on the night before or day of January 31, 2003 before Kyran was injured -- if accompanied by evidence of the time and amount consumed and testimony from a qualified health care professional that such consumption likely would have affected the degree of attention and care with which they handled Kyran or their ability accurately to recall the events that occurred -- would be admissible.  Otherwise, I would consider the evidence to be of little if any relevance that is substantially outweighed by the danger of unfair prejudice.

c. <u>Plaintiff's beliefs about childhood vaccinations</u>.

On March 12, 2003, plaintiff and her then-husband apparently asked Kyran's treating physicians requesting that they not administer any vaccinations because they felt that the side effects were too risky.  ECF No. 82-8.  In addition to relevance, plaintiff argues such testimony risks raising a strong emotional response.  Defense counsel argues this is relevant because it is "directly relevant to Kyran's medical well-being."  ECF No. 82 at 4.  Baloney!  Unless defendants have evidence from a qualified health care professional that their request, made 12 days before Kyran died, had anything to do with his injuries or death, it is irrelevant and, in any event, patently inadmissible under Rule 403.

d. <u>Ms. O'Connell's temper</u>.

Apparently Mr. Ramirez's once observed Ms. O'Connell lose her temper when she was at an airport reaching for her luggage and, in the process, knocked Kyran over.  Mr. Ramirez testified in his deposition that he would have believed that it was an accident if it weren't for her

angry disposition at the time.  Who hasn't lost his temper dealing with baggage issues at an airport?  This is classic propensity evidence that would not be admissible under Fed. R. Evid. 404(b), unless somehow plaintiff opens the door to it.

e. <u>Evidence that Ms. O'Connell admitted to shaking Kyran on another occasion</u>.

In his deposition Mr. Ramirez testified that Ms. O'Connell told him (twice) that on one prior occasion Kyran wouldn't stop screaming, and she shook him.  ECF No. 82-10 at 3-4, depo. pp. 152-54.  Whether such testimony would be admissible depends on the context.  On its face it is inadmissible character/propensity evidence.  However, if Ms. O'Connell were to testify that she had never before shaken Kyran, it could be used for impeachment.  If she were to testify that on January 31, 2003 or the previous night, she shook Kyran, the testimony would potentially be admissible under Rule 404(b) to show absence of mistake or accident.  In short, it depends on the context of the evidence and arguments presented at trial.

f. <u>Marijuana tincture</u>.

Mr. Ramirez has testified that Ms. O'Connell gave Kyran a few drops of marijuana tincture while he was teething.  This is moot, as defendants have agreed not to mention this at trial.

g. <u>Backdoor pardon</u>.

In his deposition, Mr. Ramirez described plaintiff's sentence having been vacated as a "backdoor pardon."  ECF No. 71-2 at 220.  His characterization of what happened is irrelevant and is excluded.

**11. <u>ECF No. 74: Plaintiff's Motion in Limine to Bar Opinion Testimony of Dr. Kathryn Wells</u>.**

Dr. Kathryn Wells is a board-certified child abuse pediatrician.  She works at Children's Hospital and has been a member of the Child Protection Team since 2001. She was on call when Kyran was brought into the hospital on January 31, 2003.  She examined him, obtained his history, prepared a detailed evaluation of his condition, and passed her thoughts on to the doctors who would be performing surgery and other hands-on treatment for Kyran.  Like Dr. Fenton and Dr. Taravella, Dr. Wells is of the opinion that Kyran's injuries are typically not found in a fall. Such injuries are associated with rotational forces, i.e., acceleration, deceleration, with some turning, such as when a baby is shaken or subjected to a hard-surface impact.  She bases her opinions on her training and experience but also on medical studies documented in articles in the medical literature, some of which she specifically identified in her testimony at the September 17, 2020 hearing.  She testified (and there was no contrary evidence presented) that her opinions are generally accepted in the fields of pediatrics and neurosurgery.  She has testified as an expert in court more than 100 times.

Like Dr. Fenton and Dr. Taravella, Dr. Wells is not a retained expert.  She testified and expressed her opinions in the criminal case three times: at a preliminary hearing in 2003, at the 2004 criminal trial, and in the 2016 hearing on plaintiff's motion to set aside her conviction.  Her opinions today are the same as they were in 2003 and as she expressed them on the occasions when she testified and was subject to cross-examination.  Defendants have not asked her to express any opinions that she had not expressed on those occasions.  Perhaps needless to say, she has also been deposed by plaintiff in this case in addition to repeating her opinions and the bases for them at the September 17, 2020 hearing in this case.

I need not repeat my discussion of the same objections plaintiff poses to Dr. Wells' testimony as she posed to Dr. Taravella's and Dr. Fenton's testimony.  So long as her opinions are

those that she has expressed in a combination of her medical records and her prior testimony in the criminal case, there is no Rule 26 issue.  Her credentials as a pediatrician and, in particular, a child abuse pediatrician, are unchallenged.  Her opinions will be helpful to the jury in understanding the relevant medicine, and the evidence is that they are well grounded in medical science.  Plaintiff has not provided evidence to the contrary of any of that.  I am satisfied that defendants have met their burden to show relevance and reliability under Rule 702.  The motion is denied.

## ORDER

1.  ECF No. 59 is GRANTED IN PART AND DENIED IN PART.  The motion is denied in all respects save the limited exception I have described regarding his opinion as to whether intracranial pressure causes retinal hemorrhages.

2.  ECF No. 60 is GRANTED IN PART AND DENIED IN PART.  The motion is denied in all respects save the limited exception I have noted concerning her use of the term "denialist" in describing Dr. Barnes.

3.  ECF No. 61 is GRANTED, with the caveat that evidence relating to expert fees or payments is admissible.

4.  ECF No. 63 is DENIED.

5.  ECF No. 66 is GRANTED IN PART AND DENIED IN PART.  Neither the defendants nor the plaintiff may elicit opinions for Dr. Kinney about the existence or causes of the so called "shaken baby syndrome," or about the specific causes of the edema (brain swelling) that Kyran exhibited in this case.  The motion is otherwise denied.

6.  ECF No. 67 is GRANTED IN PART AND DENIED IN PART.  Ms. Wahlgren may testify as an expert, assuming a proper foundation, to the standard of care applicable to Ms. Tuggle in terms of investigating and reporting on incidents of suspected child abuse.

7.  ECF No. 68 is DENIED.

8.  ECF No. 69 is GRANTED IN PART AND DENIED IN PART.  Mr. Vigil may testify, consistently with his report, about police investigation and interrogation techniques and whether Sgt. Alejo's investigation in this case, including specifically his interviews of Mr. Ramirez and Ms. O'Connell and the process of obtaining written statements, was consistent with the standard of care applicable to police officers at the time.  He cannot, however, express opinions on whether Sgt. Alejo coerced or fabricated evidence or whether his denial of doing so is credible or express any other opinions about Sgt. Alejo's credibility.  He may provide testimony concerning Dr. Davis's opinions to the extent described in this Order.

9.  ECF No. 70 is GRANTED.

10.  ECF No. 71 is GRANTED IN PART, DENIED IN PART, and MOOT IN PART. This motion has multiple parts, and the Court's rulings on each of them are set forth earlier in this order.

11.  ECF No. 74 is DENIED.

DATED this 25th day of September, 2020.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge